STATE v. ORVILLE GOLDEN, Appellant.—No. 38813.—183 S. W. (2d) 109.

Division Two, September 5, 1944.

Rehearing Denied or Motion to Transfer to Banc Overruled, November 13, 1944.

*Morris A. Shenker* and *Louis E. Zuckerman* for appellant.

588

590

*Roy McKittrick*, Attorney General, and *Gaylord Wilkins*, Assistant Attorney General, for respondent.

WESTHUES, C.—Orville Golden was convicted in the circuit court of the city of St. Louis, Missouri, on a charge of embezzlement and sentenced to serve three years' imprisonment in the penitentiary. He appealed. Golden, Ed Hill, Earl Jenkins and Paul Hulahan were jointly charged with the offense. A severance was asked for and granted. Hill was tried and convicted. His sentence was reversed and the cause remanded for retrial. See State v. Hill, 352 Mo. 895, 179 S. W. (2d) 712.

Appellant challenged the sufficiency of the indictment. We considered this question at length in the Hill case and held the indictment sufficient. We adhere to our former ruling and therefore need not review the question again. Appellant filed a motion to continue the case alleging that the inhabitants of the city of St. Louis were so prejudiced against him that it was impossible to obtain a jury that would fairly try the issues involved in the case. Evidence was offered by appellant in support of his motion. This evidence consisted in the main of newspaper articles concerning the trial of Earl Jenkins. We learned from these articles that Jenkins was tried on the same charge and acquitted. The acting circuit attorney, Henry Morris, seems to have been highly incensed at the verdict of the jury. This is evidenced by the articles introduced in evidence in which were quoted statements attributed to Morris to the effect that the system of selecting jurors in the city of St. Louis was such that many unqualified persons were placed on the jury panel. Morris

also complained that too many men of union affiliation were on the jury. It was also found that two ex-convicts had been drawn for jury service. These were of course rejected and were not included on the Jenkins panel of qualified jurors. The newspapers made much out of Morris' complaint and the method of jury selection was severely criticized. Investigations were demanded. The outbursts of Morris and of the newspapers criticizing the jury system constituted for the most part "shooting in the dark". One rotten apple does not mean that all others in the barrel are also rotten. Nor does one miscarriage of justice by a jury justify an assertion that the whole jury system is unsound. No human institution is perfect. Many of the articles and editorials also criticized and severely condemned the practice in vogue in Missouri, under our present law, of compelling a severance when asked for by a defendant jointly charged with another. All this resulted in a number of investigations of the system of selecting juries. One investigation was by a grand jury, another by the circuit clerk's office, another by the circuit attorney and still another by an independent fact finding agency called the Governmental Research Institute. Under the law the circuit judges of the city of St. Louis constitute the Board of Jury Supervisors. This board met and called Mr. Morris to specify and substantiate his charges. Morris appeared before the board and stated that he was at that time making an investigation and was not prepared to comply with the board's request. A grand jury investigated the question and pronounced the system of jury selection as "excellent". The Governmental Research Institute, at the request of the circuit judges, made a thorough investigation. It compared the system in vogue in St. Louis with methods employed in other large cities. Representatives of the Research Institute were present and observed the manner of selecting jurors for various cases tried during the May term. Golden's trial was one of these cases. In its report a number of suggestions ▮▮▮▮ for improvement were made. However, the report introduced in evidence by appellant revealed that nothing materially wrong was found. We quote from the report as follows:

"A study of the results of the analysis of the jury list leads to the conclusion that the jury list is fairly representative of the community."

. . .

"The central jury assembly room which was instituted in 1936 is an efficient and effective method of assigning veniremen by chance to the various courts in need of juries. In the course of this survey members of the staff of the Institute observed the procedure followed in jury assembly rooms in the various other cities included in the study. Nowhere was there to be found a more effectively arranged and operated central jury assembly room than in St. Louis."

Concerning the Jenkins jury the report had the following to say:

"The Circuit Attorney stated that 21 of the 36 members of the Jenkins panel indicated union affiliation. If the jury list contains approximately 43% at present affiliated with unions and 57% with a present or past union affiliation, as would be indicated by the test, it does not appear surprising that 36 names drawn by chance from a wheel would contain twenty-one members of a union."

A number of these investigations were in progress prior to the trial of appellant. A grand jury had completed its investigation and the newspapers had published the result. One such report carried a headline: "City Jury System Is 'Excellent', Grand Jury Says". Another read as follows: "Jury Paneling System Okay, Probers Say". These latter articles appeared in the press on April 3, 1942. Most of the articles and editorials concerning the jury system and condemning the verdict in the Jenkins case appeared in the newspapers during the month of March and the forepart of April, 1942. Golden was tried in the month of May. The trial judge, the Honorable Charles B. Williams, after hearing all the evidence on the motion, made the following comment which reflects the attitude of the court and its ruling:

"THE COURT: The ruling of the Court will be that the proper test of that, to determine if the state of the public mind is such, from the publicity, on account of the newspaper articles and editorials offered in evidence, that it would so prejudice public minds that the defendant could not get a fair trial, should be tested by the examination of the regular panel of jurors who should be brought here. We don't know what part of the public read these editorials or these newspaper articles, or what opinions they formed, if any, with reference to the matters suggested by you. There still may be a large part of the public who were not impressed with the publicity, and could give the defendant a fair and impartial trial, and that matter will be properly tested by bringing the regular jury panel here and examining them, and you can conduct the examination, putting to them these newspaper editorials and publicity, such as you desire to inquire of them, whether they had formed any opinion, or whether those matters would influence them in reaching a fair and impartial verdict on the evidence that will be heard in this case. So the application for a continuance will be denied at present."

Thereafter the examination of prospective jurors proceeded. The examination covers over four hundred pages of the bill of exceptions. We find that the trial judge was exceedingly liberal in his rulings. The attorneys were permitted to examine each juror extensively. The court was also liberal in sustaining challenges and in excusing veniremen who had formed any opinion concerning the case. On three occasions men were excused when the attorney for the defendant deemed them qualified for jury service. Appellant in his points and au-

thorities has not raised any question as to the qualification of any juror selected. His sole complaint is that the trial judge should have continued the case, because, as he contends, the newspaper articles and the investigations of the jury system had so prejudiced the public mind that he could not have a fair trial at that time. Appellant urges that the great number of jurors disqualified was evidence of existing prejudice. Many of those excused may have been prejudiced against the state. The fact that the court excused three who appellant deemed qualified lends support to this statement. Again, the number excused for cause was unusually large because the trial court was exceedingly liberal in granting challenges. We find from examining this question that the law is well settled that a trial court has a wide discretion on the question of granting a continuance in cases of this kind. See 22 ██ C. J. S. 738, sec. 482; also page 788, sec. 497; State v. Pyle, 343 Mo. 876, 123 S. W. (2d) 166 (3, 4). A rule peculiarly applicable to the situation at hand is stated in 22 C. J. S. 789, sec. 497, as follows:

"What constitutes unusual or extraordinary circumstances sufficient to entitle accused to a continuance is ordinarily a question addressed to the sound discretion of the trial court, and as such court can much better determine the propriety of a postponement on this ground than can the appellate court, it requires a very strong showing to induce the higher court to interfere. In any event the excitement must be such that its natural tendency would be to intimidate or swerve the jury; and the prejudice to accused must be apparent, or proved to have been at least probable."

See also State v. Taylor, 320 Mo. 417, 8 S. W. (2d) 29, l. c. 34. We rule that we cannot say the trial judge abused his discretion in refusing to grant appellant the continuance asked for.

██ Appellant assigned error and contends that the trial court should have granted a new trial because the first sixty veniremen were selected and set aside contrary to law. We have examined this question thoroughly and find that the only deviation from the customary rule was that ordinarily when a trial judge is in need of a jury he orders the sheriff to get the veniremen. The sheriff or one of the deputies then goes to the judge in charge of the central jury room where the required number of men are drawn by lot and sent to the division from which the request has been issued. See sec. 828, R. S. Mo. (1939), Mo. R. S. A. In this case the acting circuit attorney, Henry Morris, informed the judge in charge of the central jury room that Judge Williams would need sixty veniremen in the Golden case; that a motion for continuance was pending and would be taken up immediately. This occurred about 10:00 A. M. The motion for continuance was overruled about 11:15 A. M. In the meantime the sixty veniremen who had been drawn were waiting in the central jury room. The judge presiding made inquiry as to why they had

not been called. It was shortly after that that the motion for continuance was overruled and by order of Judge Williams the sheriff went to the central jury room and brought the sixty veniremen to Judge Williams' division. We do not think this procedure invalidated the selection of the jury. The action of the circuit attorney in notifying the judge of the central jury room that sixty men would be needed was indiscreet and to some extent usurped the duties of the trial judge but the action was harmless. The jury was finally ordered by the trial judge. Appellant again complains because the second panel of thirty veniremen was segregated and kept in a separate room from other veniremen who were being examined on voir dire and also because eighteen veniremen were segregated from the second panel of thirty while twelve of the panel were being examined. We deem this point frivolous. Certainly a trial judge has the right, for convenience sake or for any reason, to call the veniremen in lots of twelve, eighteen, or any other number for examination and while that is being done to permit the other jurors to wait in rooms outside the court room. There is nothing in sec.'s. 827, 828, 832, R. S. Mo. (1939), Mo. R. S. A., cited by appellant, that sustains his contention.

■ Appellant's next assignment of error is that the trial court should have granted a new trial on account of newly discovered evidence concerning the segregation of the panel of sixty jurors at the insistence of the acting circuit attorney, also because of newly discovered evidence concerning the investigation being made by the Governmental Research Institute. With reference to the latter it is claimed that veniremen drawn for that term of court were asked questions with reference to their education, business, whether they were union men, etc. We have heretofore disposed of the first, that is, with reference to the circuit attorney's unofficial, usurpative order for sixty veniremen. As to the investigation by the institute, that was known by the jurors, appellant, state's counsel and the trial judge. The investigation was general and the evidence does not indicate that it in any way interfered with the trial of this or any other case then pending on the docket. The point must be ruled against appellant.

■ We have disposed of the first six points briefed by appellant. The next nine pertain to the admission of evidence. We will discuss these later. In appellant's points sixteen and thirty-two he contends that the state failed to prove the corpus delicti and the evidence was insufficient ■ to sustain a verdict of guilty. These points may be disposed of together. It is urged that the state failed to prove that the International Hod Carriers Building & Common Laborers Union of America, Local 42, was a benevolent and trade organization, and therefore the proof was insufficient to sustain the charge. Such a fact need not be proven by direct evidence but may be proven by circum-

stantial evidence. The evidence in this case established beyond any question of doubt that the union was a trade organization. That seems to be conceded. The evidence as to whether it was also a benevolent organization was rather meager. We note that this court said in State v. Skinner, 210 Mo. 373, 109 S. W. 38, 1. c. 41 (2):

"It is but common knowledge that organizations of this character are in existence all over this state, and that the objects and purposes of the organizations are to promote the welfare of the members of such organizations."

The name itself implies that it is a trade union. The evidence reveals that the union obtains employment for its members, carries a death benefit fund and in general lends aid to its members, especially aid improving their working conditions. As to a definition for a benevolent organization and a trade union see 10 C. J. S. 252, sec. 1; 63 C. J. 655, etc. But whether the organization was both a trade union and a benevolent association is not all important. Whether it was either or both, the offense was covered by the same section of the statute, that is, sec. 4478, R. S. Mo. (1939), Mo. R. S. A. Appellant made no contention of the question at the trial and we deem the evidence sufficient for the jury to find that the organization was a trade union and to infer that it also performed some benevolent service. There is no merit in appellant's contention. Proof that it was a trade union was sufficient to sustain the charge.

■ The evidence as to embezzlement justifies the following statement. Appellant was the secretary and treasurer of Local 42, and as such had charge of the books and money belonging to the union. The membership in this union was classified in three groups: Commercial, with an initiation fee of $50.00; TNT, with a fee of $25.00 and residential, with a fee of $15.00. Each applicant to be initiated was also required to pay $6.00 in dues and 50c to the death benefit fund. The classifications were often referred to in the evidence as the fifty-six fifty class, thirty-one fifty class and twenty-one fifty class. A large number of union members testified that they paid to Golden personally in the year 1941, from January to July, the sum of $56.50 and that they were initiated into the union. A cash journal kept by the union office was introduced in evidence. It disclosed that Golden in his own handwriting had made entries showing that the above witnesses had paid only $21.50 to the union. The local had three trustees and it was their duty to make periodical audits of the books. But in the year 1941, they did not make an audit. These trustees testified that neither Golden nor Hill, who was president of the local, requested them to make an audit. A Mr. Lanfersieck testified that he was a public acountant and about July, 1941, was requested by Golden and Hill to make an audit showing the union's disbursements, income and the amount of money on hand; that a complete audit was not wanted. Mr. Lanfersieck prepared such a statement and it was

submitted to the trustees of the union by Golden and Hill as a complete audit and also to the members of the union as a correct financial statement of Local 42. The union had an account with the Telegraphers National Bank. However, much cash was kept in safe deposit boxes and all four of the indictees had money belonging to the union either on their person or in cigar boxes and other places at their homes. One safe deposit box contained over $39,000, another over $26,000. Lanfersieck testified that Golden and Hill never informed him of this money; that he heard of no cash being on hand except that on deposit in the Telegraphers National Bank. This evidence justified the conclusion that Golden and Hill deliberately misrepresented the financial condition of the union to its members and trustees thereof.

On October 29 and 30, 1941, two men, representing themselves as being connected with the Federal Revenue Department, appeared at the office of the union and informed the officers that they had been instructed to investigate "job selling" by Local 42. We related this occurrence in detail in the Hill opinion. See 352 Mo. 895, 179 S. W. (2d) 712, l. c. 715. Golden accompanied the fake agents to a bank where about $41,000 in cash was extracted from a safe deposit box. The men represented to Golden that they desired to take this cash to the federal building for inspection. Golden took the men to that building and according to the evidence in this case neither the money nor the men have been seen or heard of since. This matter was called to the attention of the attorney for the union and at his instigation an immediate investigation by the FBI was begun. The four defendants charged in the indictment made separate statements concerning this affair. These statements harmonize and each claimed that he was innocent of any wrongdoing and that he was actually misled and the union had been defrauded by the two impersonators. The FBI agents continued their investigations and finally searched the home of Golden. Some cash was found in an out-building in a feed box. Mrs. Golden claimed this money and it was delivered to her. Golden had some cash on his person which he admitted belonged to the union. The investigators questioned Golden a number of times and informed him that it looked bad for him. Mrs. Golden was present at this time. The agents testified that Golden said: "I know it looks bad for me." Whereupon his wife said: "Orville, don't be the goat. If you are wrong admit it and take your rap, but don't take the rap for anyone else." They testified that Golden then requested his wife to leave and thereafter made a confession which was reduced to writing and signed by him. In this confession he stated that the four defendants had conspired to embezzle money of the union; that $6,000 in cash had been taken from a safe deposit box on July 12, 1941, and divided equally among the four; that they intended to take more cash from the deposit box but had been prevented from doing so because the fake revenue men had taken all the

cash from that box. In this confession Golden further stated that to cover up the shortage the records in the union office had been falsified as to the amounts of initiation fees that had been paid. Thereafter the four defendants were arrested and the International Organization took charge of Local 42. An audit was made of the books by an accounting firm. This audit disclosed a shortage of about $86,000. It showed that on numerous occasions the cash journal disclosed $21.50 to have been paid by a member when in fact $56.50 had been paid. The auditors testified at length and were severely cross-examined. Appellant complains that the audit was not accurate, but the auditors' evidence revealed that they took into account only the amounts actually paid into the union from January 1, 1941, to October 11, 1941, in ascertaining the shortage found.

Golden testified, but his examination in chief was limited to his written confession. The cross-examination was therefore likewise limited. He testified that the confession was not true. His explanation of why he had made it was as follows:

"Q. Please tell, Mr. Golden, this Court and jury, just how you happened to make that statement. A. Well, I was questioned for quite a long time, and after we came back from dinner Mr. Hunt and Mr. Duffey told me, they said, 'Golden, we think you are innocent, and you will have to give us something to work on.' He said, 'It seems to me like you are being made a goat of by these other three men'—which were Hulahan, Jenkins and Hill. And told me—he said, 'You will have to make some kind of a statement involving yourself and those other three men, and in turn we will be able to take those men in custody and question them. By doing that those men will admit the participation in this here Forty-one thousand dollars with these two alleged fake Internal Revenue Department men.' And I gave them the statement that was just read to the Court."

An instruction was given at defendant's request on the question of whether the confession was given voluntarily. The jury found against him on that issue. The defendant did not see fit to deny the many incriminating circumstances and we cannot see how a jury anywhere, at any time, could come to any other conclusion than that he was guilty. The evidence was overwhelmingly against him.

■ Appellant asserts that the confession should not have been admitted for the reason that it was obtained under coercion, duress, promise of immunity and by trick after long hours of grilling. The record contains not one iota of evidence to sustain the claim of coercion or duress. As to a trick and promise of immunity the defendant's evidence was rather vague. The state's witnesses denied making any promise. The court instructed upon that issue at defendant's request. The defendant cited in support of his contention such cases as State v. Butts, 159 S. W. (2d) 790, 349 Mo. 213; State v. Williamson, 99 S. W. (2d) 76, 339 Mo. 1038; McNabb v. United States,

318 U. S. 332. The Butts case does not support appellant because he introduced no evidence to support the charge of duress. In the Williamson case it was conceded that a promise had been made. The McNabb case was decided on a United States Statute not applicable to the present situation. There was also evidence of duress.

 Appellant contends that the written statements of Hill, Hulahan and Jenkins, as well as his own, with reference to the two fake revenue men were erroneously admitted. These statements, as we see the situation, were favorable to appellant. They tended to support his theory that he was entirely innocent as to any conspiracy with the impersonators. In Golden's confession, where he incriminated himself, he stated that they, the four indictees, were prevented from taking more money because it had been given to the two imposters. Appellant's attorney in his cross-examination of state's witnesses, especially the FBI agents, showed that Golden always claimed that he was entirely innocent of any wrongdoing with reference to the impersonators getting the money. The statements of himself and those of the other three indictees supported that theory. Appellant asserts that we held in the Hill case that Golden's confession was not admissible as evidence against Hill; that therefore Hill's statement should not be used against Golden. The fallacy of this argument lies in the fact that Golden's confession implicated Hill in the embezzlement. Hill's statement and those of Jenkins and Hulahan do not implicate Golden but tend to exonerate him.

 Luella Jones, a witness for the state, had been an employee in the office of the union during some of the months of 1941. She identified records kept in the office and gave information disclosed by these records. Appellant complains that her evidence with reference to payments having been made by members of the union was hearsay. The witness had been working in the office under Golden's direction. The testimony objected to concerned a record kept under his own supervision. We cannot see how the hearsay rule could have any application and we see no merit in his contention. Nor was her evidence a comment on a written instrument as appellant contends. The witness made some explanation as to the meaning of certain records. This was entirely proper.

 Appellant also complained of evidence given by one of the investigators, James B. Hunt, concerning inquiries made about the impersonation of the revenue men. Hunt was permitted to state that they failed to solve the mystery about the $41,000 taken from the safe deposit box and also that they failed to find the impersonators. This was an ultimate fact rather than a conclusion as appellant contends. Hunt in his evidence also stated that he inquired of Hill of the whereabouts of Golden. This inquiry was made during the investigation, and while not material the evidence was harmless, did not tend

to prove any fact at issue and was given as an incident leading up to other matters which were material.

 Appellant states that instruction number four was erroneous because it contained only an abstract proposition of law. The instruction defined circumstantial evidence and stated that to authorize a conviction the facts and circumstances in evidence should be consistent with each other and inconsistent with any reasonable theory of defendant's innocence. We find nothing wrong with this instruction. In cases where the state relies entirely on circumstantial evidence such an instruction should be given. In this case much of the evidence was of such a character and therefore the instruction was entirely proper. The only complaint appellant makes is that it was an abstract proposition of law. There is no merit in his point.

 Appellant asserts that instruction number one was erroneous because it submitted the question of whether Local 42 was a trade and benevolent organization and also asserts that there was no evidence to support such a finding. We have heretofore disposed of this point. Appellant also says that the instruction was erroneous because it authorized the jury to convict the defendant if he embezzled funds of the union at any time within three years before the filing of the information. The charge was that the embezzlement was committed between January 1 and October, 1941. The evidence showed that the crime was committed during that time. Appellant's confession also so states. The only effect of the instruction, as we see it, is that it bars any other prosecution of appellant for embezzlement of funds of Local 42 within the three years embraced in the instruction.

 Appellant says that the trial court committed reversible error in permitting a juror, after a recess had been announced, to inquire of the court, whether he, the juror, would be permitted to ask a question of a witness on a point that had not been made clear. The judge explained this matter in full and the record shows that the court informed the juror that such practice was not encouraged and it would be better to let the lawyers do the questioning. We think the matter was handled properly. The cases of State v. Alexander, 66 Mo. 148, l. c. 163 and State v. Beedle, 180 S. W. 888, cited by appellant, pertain to matters transpiring between the court and the jury after the cases had been submitted for deliberation. In the Beedle case the foreman of the jury sent a written note to the judge asking for information on a point of law. The judge answered the note in writing and sent it to the foreman. The same was true in the Alexander case and in addition thereto the court communicated with the jury privately a number of times after the case had been submitted. The action of the judges in both cases was condemned and we think rightly so. In the case before us the matter complained of was trivial and, as fully explained, it could not have prejudiced appellant. See Chinn

v. Davis, 21 Mo. App. 363; Glenn v. Hunt, 120 Mo. 330, 25 S. W. 181; 64 C. J. 1037, sec. 833, also page 644, sec. 584.

The state's attorney in his argument to the jury commented on the fact that appellant testified but did not explain or deny incriminating evidence against him. Appellant argues that this was a. violation of the statutory prohibition forbidding comment to be made on the failure of the defendant to testify. There is no merit in this point. It is settled law that when a defendant does testify and limits his examination the prosecutor may call attention of that fact to the jury. State v. Pierson, 343 Mo. 841, 123 S. W. (2d) 149, l. c. 157 (14); State v. Drew, 213 S. W. 106, l. c. 107.

Appellant also urges that reversible error was committed in informing the veniremen that appellant had been granted a severance. The record shows that the state's attorney, Morris, informed the jury Golden had asked for and was granted a severance. On objection the court informed the jury that the court had granted the severance. We do not see how the fact that a severance had been granted could have been kept from the jury in this case. In fact the veniremen were examined specifically by the state and by appellant as to whether that fact would prejudice them. Appellant was entitled to a severance under the law and the fact was not used in this case in an attempt to disparage him.

Appellant assigned error to a number of statements made by the prosecutor during his argument to the jury. One complaint was that he called a number of jurors by name. Neither appellant nor the state cited any authority on this question. We say, however, without hesitation, that the practice is unethical and improper and should not be tolerated by trial judges. However, whether prejudice resulted to any party litigant is doubtful. It seems that juries, usually made up of fair-minded men, would resent such conduct in the trial of a lawsuit. Granting a new trial for misconduct of counsel lies largely within the discretion of the trial court. Other statements complained of have been examined and we find that on a number of occasions the trial court sustained appellant's objection and admonished the jury to disregard the objectionable statements. On one occasion the state's attorney withdrew his statement when appellant's attorney objected. The record does not justify us in granting a new trial. 23 C. J. S. 604, sec. 1117; State v. Hinthorn, 315 Mo. 203, 285 S. W. 990, l. c. 992 (9). We may say that this was a hotly contested lawsuit. The remarks of counsel on both sides revealed that much feeling existed. The trial judge displayed unusual calmness and we may say granted the defendant all of his rights under the law. We may also add that counsel for the defendant made a gallant and vigorous fight on behalf of his client. We fail to discover any point that was overlooked. In view of the overwhelming evidence against appellant, the deliberate falsification of the books, etc., we

602

deem the punishment assessed, three years' imprisonment, evidence that the jury was not prejudiced against him. The maximum is five years' imprisonment.

Finding no reversible error in the record the judgment is affirmed. *Bohling* and *Barrett, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.