STATE of Missouri, Respondent,

v.

Charles Lee CRAWFORD, Appellant.

No. 52049.

Supreme Court of Missouri,
Division No. 1.

June 12, 1967.

Motion for Rehearing or to Transfer to Court
en Banc Denied July 10, 1967.

Norman H. Anderson, Atty. Gen., Jefferson City, J. Brendan Ryan, Sp. Asst. Atty. Gen., St. Louis, for respondent.

J. W. Grossenheider, Lebanon, for appellant.

HENLEY, Judge.

By amended information alleging prior felony convictions defendant was charged with murder, first degree, of Edward L. Pridemore on February 2, 1965, in Laclede county, Missouri. Section 559.010 (all statutory references are to RSMo 1959 and V.A.M.S.) Defendant admitted, and the court found, that he had been convicted of prior felonies, sentenced and imprisoned therefor as alleged. A jury found him guilty as charged. The court assessed his punishment and sentenced him to imprisonment for life. Sections 556.280 and 559.030. He was represented at the trial, and during pre-trial and post-trial proceedings, by counsel appointed by the trial court; he is represented in this court by the same counsel who has filed a printed brief and pre-

sented oral argument in defendant's behalf. Counsel's devotion to the interest of his client and his zeal in the maintenance and defense of his rights exemplifies the highest calling of his profession.

The dead body of Pridemore was found in a ditch alongside a gravel road approximately two hundred yards north of U.S. Highway 66 in Laclede county at about six o'clock a. m., on February 2, 1965. Defendant was arrested in Texarkana, Texas, early in the evening of February 3, on other charges, and gave oral and written statements to an Agent of the Federal Bureau of Investigation in which he confessed to the murder of Pridemore. He was returned to Laclede county on February 4, and on that date gave oral and written statements to the prosecuting attorney in which he again confessed to the murder of Pridemore. On February 5, defendant waived his preliminary examination in Magistrate court and was bound over to Circuit court. On Monday, February 8, an information was filed which did not allege the prior felony convictions. At defendant's request he was not brought before the court for the appointment of counsel until the following Friday, February 12. On that date, it appearing that defendant could not employ counsel, the Honorable J. W. Grossenheider of Lebanon was appointed to represent him. On March 30, 1965, defendant appeared with counsel and entered two pleas: (1) not guilty, and (2) not guilty by reason of mental disease or defect excluding responsibility; the case was set for trial for June 23, 1965. On April 1, pursuant to motion of defendant, the court appointed three named physicians to examine and report upon the mental condition of defendant at the time of the alleged criminal conduct. Section 552.030. The report of this examination was filed May 6. On May 8 defense counsel made an oral motion to dismiss the charges and urged the court to order defendant delivered to police authorities of Indianapolis, Indiana, where he was wanted on two other similar charges; the motion was overruled on the same day.

Further details pertaining to the motion will be referred to later in connection with the first point briefed. On the same day, pursuant to another oral motion, the court appointed Dr. Frederick W. Coons, a physician of defendant's choice, to examine and report upon his mental condition at the time of the alleged crime. Thereafter defendant filed two motions to suppress evidence. The first, filed May 20, to suppress all oral and written statements made by him from the moment of his arrest, was on federal constitutional grounds that he was denied counsel during extensive interrogations in Texas and Laclede county. The second, filed June 3, to suppress all evidence of articles taken from his person and from his automobile in Texarkana on February 3, was on the grounds that his arrest was without a warrant or probable cause and, hence, the search of his person and automobile and the seizure of articles therefrom were in violation of his state and federal constitutional rights. The motions were consolidated, heard, and overruled on June 12. Evidence heard on the motions will be referred to later in connection with points II, III and IV of defendant's brief.

The points briefed by defendant relate to alleged errors in overruling his oral and written motions; the admission of evidence; failure to prove corpus delicti and venue; in giving and refusing instructions; in limiting inquiries of defendant on voir dire examination; and, in permitting an ineligible person to serve on the jury. Defendant does not question the sufficiency of the evidence to sustain conviction, except that evidence pertaining to proof of the corpus delicti and proper venue; therefore, a brief summary will suffice.

Defendant, age 26, left his home in Indianapolis, Indiana, on or about February 1, 1965, in a 1962 model Pontiac en route to the southwest part of the country; sometime during the night of the 1st or early morning of the 2nd, on the outskirts of St. Louis, he picked up a hitchhiker, Edward L. Pridemore, a recently discharged soldier. Pridemore put his Air Force baggage in

the back seat and got in the passenger's seat in the front. They drove southwest on U.S. Highway 66 for approximately two hours and stopped to eat at a roadside cafe. Leaving the cafe they continued their journey with defendant driving and Pridemore in the front passenger's seat. Pridemore leaned against the door and soon went to sleep. Defendant saw him asleep and decided to kill and rob him. While driving, defendant pulled a .22 caliber pistol from his belt, pointed it at Pridemore's head and fired six shots, four of which struck Pridemore in the face, head and neck and left hand, and two struck and broke out the rear glass of the automobile. Blood spurted and ran all over the automobile. Defendant drove on, "not more than a mile," and turned right off Highway 66 onto a gravel road to rob and dispose of the body. He drove north on this road two or three hundred yards. Turning around, he drove a short distance south, pulled over close to the road ditch on his right and stopped. He got out of the car, walked around its rear and pulled Pridemore out the right front door and into the ditch. Pridemore was still alive at that time; defendant could hear him breathe, " * * * or what I called a 'death rattle.'" He took Pridemore's billfold from his pocket and drove on, stopping to eat at The Cowboy Inn, a cafe and gasoline service station on Highway 66 in Lawrence county (approximately 80 miles southwest of Laclede county). He left the cafe and drove to Tulsa, Oklahoma, where he checked in at a hotel and slept. From Tulsa he drove to Texarkana, arriving there late in the afternoon or early evening. He parked his automobile on Texas avenue, not far from the police station, and walked a short distance to a theater where he saw a movie. Leaving the theater, he started walking through an alley toward his automobile. He was arrested in the alley behind the police station by Texarkana police officers.

The body of Pridemore was found by Mrs. Margaret Wills, who was en route home after taking her husband to Conway. She and a neighbor called the Sheriff's office. The Sheriff and Frank O'Dell, a member of the Missouri Highway Patrol, arrived at the scene within a few minutes after the telephone call. Trooper O'Dell testified that it was a very cold February morning; that Pridemore's body was lying face down in the ditch on the west side of a gravel road north of the Conway Truck Stop on U.S. Highway 66 in Laclede county; that blood was on the clothing, and on the face and hands of the body, and on the ground under the face; that blood on the clothing had begun to dry, but it was still wet under the face and running from the nose; that he found several distinctive footprints in the ditch around and near the body; that these footprints were made by heavy rubber-soled shoes, the soles of which had a design of bars running crossways and lengthways; that he had seen the shoes worn by defendant at the time of his arrest in Texarkana and the soles are of the same type and have the same markings as those which made the footprints at the scene; that he had a close look at the body after it was cleaned; that the bullets entered the left side of the head and neck; that the wounds were made by .22 caliber bullets. James Coomer and Norma Meyers, employees of The Cowboy Inn in Lawrence county, testified that they recognized defendant as being the man who ate alone in the cafe near 6:30 a. m on February 2, 1965, and inquired about the Oklahoma turnpike. To the extent necessary, further evidence will be referred to in connection with discussion of the legal questions involved.

■ Defendant's first point is that the court erred in overruling his pre-trial oral motion of May 8 to dismiss the charge and order defendant delivered to Indiana authorities. As grounds for the motion defendant's counsel stated that defendant could not have a fair and impartial trial in Laclede county on June 23, because of widespread publicity given the case through newspapers, radio and television. In support of his motion he introduced in evi-

dence three front-page newspaper articles, two from the Lebanon Daily Record and one from The Lebanon Rustic Republican. We have read the articles; each refers to the simple fact (among others) that defendant had pleaded not guilty by reason of insanity, had been examined to determine his mental condition, and declared sane; all three are brief, conservative, objective reports, without bold, glaring headlines and are more or less buried on the front page as compared with other news articles. Neither would be likely to stir passions or prejudice; at least, the trial judge apparently so found, and he was in a much better position to determine this than are we from the cold record. Defendant offered no proof on his allegations of adverse, prejudicial radio and television coverage. He did not move for a continuance. Nor did he apply for a change of venue to another county where the alleged prejudice would not exist. Both avenues were available to him, but for reasons of his own he confined himself to a request that the charge be dismissed. He stated no legal grounds for dismissal and the court properly overruled his motion. State ex rel. Dowd v. Nangle, 365 Mo. 134, 276 S.W.2d 135, 137–138 [2, 3]; State ex rel. Griffin v. Smith, 363 Mo. 1235, 258 S.W.2d 590, 593 [6, 7]. Also see: State v. Golden, 353 Mo. 585, 183 S.W.2d 109; State v. Spica, Mo., 389 S.W.2d 35; State v. Amerison, Mo., 399 S.W.2d 53. Decisions of the United States Supreme Court cited by defendant are not applicable.[1]

Defendant's next point· is that the court erred in overruling his motion to suppress all evidence of oral and written statements made by him and in admitting those statements in evidence, on the ground that he was denied counsel in violation of rights guaranteed by the Sixth Amendment to the Constitution of the United States. In support of his point he cites five decisions of the United States Supreme Court, and a paper entitled: The Meaning and Scope of Escobedo v. State of Illinois, appearing in 38 F.R.D. 441.[2]

■■■ The case was tried after *Escobedo* and before *Miranda*. Defendant acknowledges that *Miranda* is not applicable, because held not retroactive in *Johnson*. But, he says, this record brings the instant case squarely within the rule and principles announced in *Escobedo*. We do not agree. Here, there was no investigation of this murder which had begun to focus on defendant as the suspect when he was arrested in Texas, the police did not carry out a process of interrogations lending itself to eliciting incriminating statements either at the time of his arrest or after he was taken into police custody, the defendant had not requested nor been denied an opportunity to consult with a lawyer, and he was advised of his absolute constitutional right to remain silent. We said in State v. Collins, Mo., 394 S.W.2d 368, 371 [1] that "We will not expand the *Escobedo* ruling beyond the facts of that case * * *;" the facts of *Escobedo* are not present in this case.

Evidence heard on the motions to suppress showed that defendant was arrested in Texas for violation of the laws of Texarkana while suspected of theft of an automobile. He was placed in an upstairs cell of the Texarkana jail and within an hour or so sent word to the police that he wanted

1. Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543;
 Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663;
 Turner v. State of Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424;
 Patterson v. State of Colorado ex rel. Attorney General, 205 U.S. 454, 27 S. Ct. 556;
 Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600.

2. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694;
 Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977;
 Gideon v. Wainwright, 372 U.S. 335, l. c. 342, 83 S.Ct. 792, 9 L.Ed.2d 799;
 Carnley v. Cochran, 369 U.S. 506, 82 S. Ct. 884, 8 L.Ed.2d 70;
 Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

to make a statement. As a result of his request, Agent Sam Cotton of the F.B.I. was called in and talked to defendant. Before his conversation with defendant, Cotton identified himself as an F.B.I. agent and showed defendant his credentials; he informed defendant that he did not have to make a statement, that any statement he made could be used against him in court, that he had a right to see a lawyer before he made a statement, and that if he did not have the means to employ a lawyer one would be appointed for him by a court official or judge. Defendant stated that he understood this, and at no time did he indicate a desire for counsel; nor did he at any time indicate a desire to remain silent. So far as Agent Cotton knew he was taking a statement from a man who was under suspicion for car theft only. Defendant admitted taking the car and driving it across state lines; and, when asked if he would explain the bloodstains in the car, he freely and voluntarily informed the Agent that he had murdered a man in Missouri. This was the first knowledge Cotton or any of the Texas officials had of Pridemore's murder. The statement defendant gave to the Prosecuting Attorney of Laclede county upon their return to Lebanon the day after defendant's arrest, was made after that official had likewise advised defendant fully of his constitutional rights. Defendant testified at the hearing on the motions to suppress. He stated that he had been in trouble with the law before and knew his rights, without explanation. On cross-examination, he stated that no threats of force or promises of leniency were made by the Texas officers to secure his statement, that " * * * they were real nice * * *;" that the Prosecuting Attorney of Laclede county advised him of his constitutional rights before he gave statements to that official, and that no threats of force or promises of leniency were made to him in consideration of his statements.

The court did not err in overruling his motion to suppress oral and written statements made to the Texas and Laclede coun-ty authorities or in admitting those statements in evidence.

Defendant's third point is that the court erred in overruling his motion to suppress all evidence of items taken from his person at the time of arrest and all evidence found in the automobile, because he was arrested and his person and automobile searched, and the evidence seized, without a warrant and without probable cause in violation of rights guaranteed him by the statutes and Constitution of Missouri and the Fourth Amendment to the Constitution of the United States.

Briefly, the evidence pertinent to this point is that before his arrest in Texarkana one of the local police officers had observed a Pontiac parked alone after dark near the police station and suspected that it was a stolen automobile. It was a late model car, the rear glass was broken out, and it bore an Indiana dealer's license, wired on. While standing outside the car the officers, with the use of a flashlight, could and did see blood all over the inside and on items of clothing and baggage in the back seat, as well as on the outside of the right front door. Keeping the car under surveillance, the officers later drove into the alley behind the police station as defendant walked through the alley in the direction of the parked car. Defendant was wearing clothing normally worn by persons from the climate locale of the state license plate borne by the car. Defendant hesitated when he saw the police car. Driving up alongside defendant, one of the officers got out and asked him who he was and for identification. Defendant handed the officer an Illinois driver's license and the officer asked him if that was his Pontiac around the corner with the Indiana license; defendant said: "It is not." The officer obviously did not believe that answer, for, as he returned the driver's license to defendant, he asked: "You mean to tell me that's not your car?" To this, defendant replied, "Yes, it is my car." His suspicions being further aroused by these inconsistent answers, the officer told defendant he was

under arrest, and, searching him for weapons, found a .22 caliber pistol in his belt. A few minutes later in the police station, while emptying his pockets of personal belongings onto a desk, defendant told the officers that the Pontiac had been stolen. Thereafter, the car was moved onto the police parking lot behind the station, and all items of personalty removed and brought into the police station where they were tagged for identification. Articles mentioned as having been taken from the car were defendant's coat and Pridemore's baggage. Among the items found in this baggage was another .22 caliber pistol, loose cartridges of that caliber, and a long white-handled knife.

■ Under these circumstances the police officers had reasonable cause to believe that the Pontiac was a stolen automobile, and that defendant had stolen and had driven it across state lines; therefore, his arrest without a warrant was lawful, and the subsequent search and seizure incident to the arrest did not violate constitutional guaranties against unreasonable search and seizure. State v. Cantrell, Mo., 310 S.W. 2d 866, 868–870 [1–7]; State v. Phelps, Mo., 384 S.W.2d 616, 619 [2–5]. Moreover, the articles taken from the automobile were seized after defendant had informed the police that the automobile had been stolen. The constitutional guaranties against unreasonable search and seizure afford defendant no protection, because admittedly he was neither the owner nor entitled to the possession of the automobile. State v. Green, Mo., 292 S.W.2d 283, 286 [1–7]; State v. Cantrell, supra, 310 S.W.2d 1. c. 870 [8–9]; State v. Watson, Mo., 386 S.W. 2d 24, 28 [2].

■ Defendant's next point is that the court erred in admitting in evidence all oral and written statements made by him, because, under the evidence, he did not have sufficient mental responsibility intelligently to waive counsel at any time after his arrest. Defendant asserts that the medical testimony indicated a marked lack of ability on his part to exercise judgment or make decisions and that " * * * this mental defect would most certainly preclude him from being able to intelligently waive counsel * * *." Defendant does not refer us to the pages of the transcript where specific medical testimony appears which he says would support the conclusions of this point, so we assume that he refers to the medical testimony as a whole. The jury found that at the time of the alleged offense he was not suffering from a mental disease or defect excluding responsibility; this issue and the questions raised by this point are so closely related in nature, and in point of time, that we may not say that the jury did not determine indirectly the question of fact on which the point is partly based. In determining the admissibility of defendants' statements to the officers in Texarkana and Laclede county the trial judge necessarily considered and determined whether he had the mental capacity to waive counsel when the statements were made. The trial judge had a second opportunity to consider and weigh the questions raised by this point when the motion for new trial was presented. He was in a far better position than we to make this determination and we cannot say that his ruling was clearly erroneous.

■ In point V defendant claims error in overruling his motion to exclude from evidence the written statements of defendant made in Texarkana on February 3, and in Laclede county on February 4, for the reason those statements contained evidence of an independent crime. The independent crime he has reference to is the theft of the Pontiac in Indianapolis and driving it across state lines. The record refutes defendant's contention. The two statements were read to the jury by counsel for the state; such parts of the statements as referred to the described independent crime were not read. Nor does the record show that the statements were read by the jury.

A closely related point to defendant's point V is his contention that the court erred

also in refusing to discharge the jury when a state's witness testified that defendant told him the Pontiac " * * * was a stolen car." Defendant asserts as reason for this contention that this testimony " * * * brought before the jury evidence of an independent crime * * *," and was therefore inadmissible. The record shows that when arrested in Texarkana, defendant first denied that the Pontiac was his and then immediately said it was. A few minutes later, while being booked in the police station, he was asked " * * * who the car belonged to * * *," and he said: " * * * You will find out anyhow the car was stolen * * *." State's witness Gary Collvins testified, in part, as follows: "Q. Did you question him about that car? A. I did. Q. What did he say? A. He said that it was a stolen car." Defendant objected to this answer and moved that the jury be discharged. The court sustained the objection and instructed the jury to disregard the answer, but overruled the motion to discharge.

The trial court is vested with a broad discretion in determining whether a mistrial should be declared because of alleged prejudicial testimony, and we reverse for error in such instances only where we can find that the court has abused its discretion. State v. Adamson, Mo., 346 S.W.2d 85, 88 [5] and cases there cited. The trial judge sustained the objection and instructed the jury to disregard the answer. He was in a better position than we are to determine whether this testimony was so prejudicial as to require a mistrial; he was in a better position to determine what action on his part would be adequate. He determined then, and again on motion for new trial, that his instruction to the jury to disregard the witness' answer was sufficient. We cannot find that the court abused its discretion in refusing to discharge the jury.

In his point VI defendant contends that the court erred in admitting in evidence state's exhibit number 3, a color photograph of the upper portion of the chest and arms and the neck, face and head of the dead body of Pridemore, showing bullet wounds and blood. He contends this exhibit aroused the passion, prejudice and bias of the jury against him and prevented the jury from coolly deliberating the question of his guilt or innocence.

"The rule as to the admissibility of this sort of visual evidence is well settled. Demonstrative evidence of this character is admissible if it tends to connect the accused with the crime, or to prove the identity of the deceased, or show the nature of the wound, or throw any relevant light upon a material matter at issue." State v. Moore, Mo., 303 S.W.2d 60, 65 [1]; State v. Long, 336 Mo. 630, 80 S.W.2d 154, 160 [9].

The photograph is 3½ X 5 inches in size showing those portions of Pridemore's body above described after it had been cleaned of blood except that around the site of wounds, which probably could not be eliminated completely; there is nothing gory or gruesome about it and we see nothing in the photograph which would tend to arouse the passion or prejudice of a jury. It was used during the testimony of Dr. Thomas T. Tombridge, pathologist, to demonstrate the location of the wounds and the pattern of strikes from a weapon held in close range of the head. By tattoo marks on the left arm, and by the ring on the left hand bearing Pridemore's first initial, it helped to corroborate other identification of the deceased. Its admission and use in evidence is largely within the discretion of the trial judge. He did not abuse his discretion in admitting the exhibit.

In point VIII of his brief defendant contends that the court erred in permitting Dr. E. C. Kepler to testify concerning his examination of defendant for the reasons (1) that the examination of defendant, as ordered by the court pursuant to § 552.030, was not conducted to determine whether at the time of the alleged crime as a result of men-

tal disease or defect defendant did not know or appreciate the nature, quality or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of law; and (2) that the report of the examination was made public after it was filed, contrary to § 552.020 (2).

The only ground stated at the trial for defendant's objection to Dr. Kepler's testimony was that stated as reason (1) in his above point; he did not object for the reason that the report of the examination had been made public contrary to the statute. The latter reason not having been presented to the trial court at the time of the objection, we will not consider it in reviewing this assignment of error. State v. Brown, Mo., 360 S.W.2d 618, 621 [8].

Defendant asserts that the type of examination made by Dr. Kepler was that provided for in § 552.020, that is, an examination to determine whether defendant lacked the capacity to understand the proceedings against him or to assist in his defense; that the doctor did not make an examination to determine whether at the time of the alleged offense defendant had a mental disease or defect excluding responsibility for his conduct, as ordered by the court; therefore, the doctor should not have been permitted to testify concerning his examination. We have read the doctor's report of examination filed with the circuit clerk and we have read the doctor's testimony. The report and the testimony show conclusively that the examination was all inclusive, that is, its extent was such that the doctor could, and did, determine both (1) whether defendant had the capacity to understand the proceedings and assist in his defense, and (2) whether defendant at the time of the alleged offense had a mental disease or defect excluding responsibility for his conduct. The statement in the written report that the examination was made pursuant to § 552.020 is not controlling and counsel in effect conceded at the trial that this designation of § 552.020 may have been a typographical error. The trial court did not err in admitting the testimony of Dr. Kepler.

In his next point defendant contends that the court erred in overruling his motion for judgment of acquittal, because the state failed to prove (1) the corpus delicti independent of defendant's statements, and (2) that the offense charged was committed in Laclede county. The recent death of Pridemore by several gunshot wounds in the head and neck, either one of which would have produced death, the finding of his body in a ditch with closeby footprints identified as having been made by shoes worn by defendant is sufficient proof of the two elements constituting the corpus delicti. However, both the circumstances related above and the confessions of defendant may be considered in determining whether the corpus delicti is sufficiently proved. Those circumstances correspond with circumstances related in the confessions. State v. McQuinn, Mo., 235 S.W.2d 396, 397 [1] and cases there cited.

Defendant was traveling southwest on Highway 66; one of his statements discloses that he drove about a mile farther after shooting Pridemore and turned north on a gravel road where he disposed of the body. Trooper O'Dell testified that the eastern boundary of Laclede county was about twenty-five miles east of the point where Pridemore's body was found. This evidence is sufficient to show that the shooting occurred and that the offense was committed in Laclede county.

His next point is that the court erred in giving instruction No. 8, because it failed to tell the jury that they should not consider any statements made by him if these statements were (1) made as a product of his mental disease, or, (2) made after suspicion had focused on him and before he had counsel, or, (3) made while he did not have mental capacity and judgment intelligently to waive counsel.

The fact that any statements made were "made after suspicion had focused on

him and before he had counsel" would not alone preclude the jury from considering the statements. The question is whether, during that time, any statements made were made voluntarily, or, more accurately, because the mental test is involved, whether at that time he knew or understood what he was saying and doing. The law does not permit the jury to exclude from consideration any statements made merely because they were made after suspicion of crime has focused on the person making the statement; to permit the jury to exclude such statements would permit the exclusion of voluntary statements.

 It is not required that the jury be told specifically that they shall not consider statements made while he was suffering from a mental disease or while he did not have mental capacity intelligently to waive counsel; it is sufficient to inform the jury that they may consider statements made if they find that at the time they were made they were made voluntarily and, where the mental test is involved, that defendant understood what he was saying and doing. This instruction required the jury to find voluntariness *and* " * * * that at the time defendant understood what he was saying and doing * * * " before they could consider the statements; the instruction meets the only tests required and the court did not err in giving it. See: State v. Stibbens, 188 Mo. 387, 87 S.W. 460, 462–63.

 In another point defendant contends that the court erred in refusing to give his instruction "B" on circumstantial evidence, because much of the evidence against him was circumstantial. In effect defendant concedes in the words of this point that not all of the evidence against him was circumstantial. It is not mandatory that a circumstantial evidence instruction be given where part of the evidence is direct. Defendant's confessions were direct evidence of his guilt; therefore, the court was not required to give instruction "B." State v. Spica, Mo., 389 S.W.2d 35, 52 [26–28]; State v. Smith, Mo., 377 S.W.2d 241, 244 [4, 5].

 Defendant's next point is that the court erred in refusing to permit him to inquire during voir dire examination whether any member of the panel had any feelings, beliefs or impressions that would preclude them from finding defendant not guilty by reason of mental disease or defect, although they believed him to be not guilty for that reason, for fear that if they did so find he could soon be freed from the state mental institution without being ready for release.

Defendant interrogated all members of the panel individually. He asked the first prospective juror this question: "If, after hearing all the evidence in this case if you find and believe under the Court's instructions that the defendant is legally insane, was not competent, would you hesitate to find him not guilty because of fear of a premature release from a mental institution?" An objection to this inquiry was sustained. But, without objection he made this inquiry of the juror: "Now * * * do you have any feelings at all one way or the other that would prevent you, if you felt under the evidence that the defendant was legally insane, do you have *any* feelings at all that would prevent you from finding him not guilty * * * by reason of insanity?" (Emphasis supplied.) Each member of the panel was thereafter asked this same question in substantially the same form, the form varying from time to time by inquiring whether the prospective juror had any "feelings," "beliefs," "impressions," "convictions," "preconceived ideas," "notions," "opinions," or "scruples" (and combinations of two or more of those words) that would cause him to hesitate to or prevent him from returning a verdict of not guilty by reason of insanity even though he believed that defendant was legally insane.

These inquiries as to whether the jurors had *any* feelings, etc., that would preclude their returning a verdict of not guilty by

reason of insanity were much broader than the question to which an objection was sustained. Through these inquiries defendant was permitted to determine whether the juror had *any* reason, *any* preconceived ideas or convictions, including beliefs or opinions that defendant could be released prematurely if confined to a mental institution, that would prevent his returning a verdict of not guilty by reason of insanity. His voir dire examination of the panel was not circumscribed and there is no merit in his point.

As a part of this point he contends that the court also erred in refusing to give his instruction "C", because this instruction would have removed any reluctance of a juror to find him not guilty by reason of mental disease or defect for fear that he could be released prematurely from a mental institution.

Instruction "C" is the same as that quoted in State v. Garrett, Mo., 391 S.W.2d 235, l. c. 240. In *Garrett,* l. c. 242, we held that the instruction was properly refused; that the " * * * instruction has no legitimate bearing on any fact issue which the jury must decide." Defendant recognizes that *Garrett* rules against his contentions, but he urges the court to reconsider this question and hold that such instruction is required to be given when requested by a defendant. The reasons given for our decision on this question in *Garrett* are clear and sound, and are as valid today as they were when *Garrett* was decided.

Defendant's next point is that the court erred in giving instruction No. 7 and in refusing instruction "F," because the given instruction erroneously tells the jury that if the guilt of defendant is established beyond a reasonable doubt it is their *duty* to convict, but that if they have a reasonable doubt of his guilt they *should* acquit. He contends that the jury should have been instructed that it was their duty to acquit if they had a reasonable doubt of his guilt. We note that his instruc-tion "F" does not tell the jury it is their duty to acquit.

▬▬▬ The only assignment in his motion for new trial that may be said to even remotely relate to the point appearing in his brief is the alleged error in refusing instruction "F" for the reason " * * * defendant was entitled to have the jury know that the burden rests upon the state to prove beyond a reasonable doubt that defendant is guilty and that unless they so find they should acquit * * * and they should have been so told * * * in instruction numbered 7 * * *." The point briefed is quite different from the assignment of error in the motion and is not preserved for review; the assignment of the motion is not briefed and is, therefore, abandoned. Furthermore, instruction 7 tells the jury what this assignment would require. Moreover, an almost identical instruction was held to be not erroneous in State v. Caffey, Mo., 365 S.W.2d 607, 611–612 [9–11].

In his last point defendant charges that the court erred in permitting John B. O'Neil to serve as a juror for the reason that as a licensed attorney at law he was ineligible to serve.

This assignment in his amended motion for new trial was not supported by affidavit, but at a hearing on the motion defendant offered to prove by Mr. O'Neil and Marion Spicer, clerk of this court, that at the time of trial he was a licensed attorney at law of this state. He further offered to prove by Mr. O'Neil that he was first licensed in 1935 while residing in Kansas City, Missouri; that he had been a resident of Laclede county for approximately twenty years, but had continued to pay his annual bar enrollment fee to the circuit clerk of Jackson county. Defendant offered to prove further that neither he nor his counsel knew that Mr. O'Neil was a licensed attorney at law until the day he filed his amended motion alleging this ground. The transcript shows that Mr. O'Neil was a member of the jury, and its

foreman. The parties agree in their briefs that Mr. O'Neil was a licensed attorney at the time. The state agrees that counsel for defendant did not know Mr. O'Neil was an attorney and asserts that neither counsel for the state nor the trial judge knew this fact. If we assume the truth of this assertion in the state's brief (and it is not denied) the obvious conclusion would be that Mr. O'Neil has not engaged in the practice of law since becoming a resident of Laclede county.

Section 494.020 provides: "The following persons shall be ineligible to serve as a juror, either grand or petit:

" * * *

"(4) Any licensed attorney at law;

" * * *."

Section 494.050 provides: "No exception to a juror on account of his citizenship, nonresidence, state or age or other legal disability shall be allowed after the jury is sworn."

In State v. Hermann, Mo., 283 S.W.2d 617, l. c. 618–619, the court adopted this statement from Massman v. Kansas City Public Service Co., Mo., 119 S.W.2d 833: " * * * The applicable rule has been thus stated: 'The policy of our law is that the qualification of a juror should be determined before the trial begins; that such qualification is a matter of exception; and that the parties must develop such information and take such exceptions, as they desire to preserve for appellate review, before the jury is sworn. [Citations.] An exception is made to this rule so that "where it is shown that matters which might establish prejudice or work a disqualification were actually gone into on the voir dire, and false answers were given, or deception otherwise practiced, the court will be permitted to consider the question on the motion for a new trial, either upon oral testimony taken at a hearing on the motion, or by affidavits"; because "the situation is closely akin to that when a new

trial is sought for newly discovered evidence; and the complaining party is not to be left without a remedy for the want of a prior objection and exception, when the disqualification of the juror was one which he by due diligence could not have learned sooner." ' "

Defendant attempts to bring himself within the exception to the rule by arguing that juror O'Neil was asked on voir dire if he knew of any reason why he could not sit as a juror in the case, and O'Neil answered, "No." Actually, the question to which O'Neil gave this answer was: "Do you know of any reason at all why you couldn't sit as a juror in this case and give fair and impartial consideration to all the evidence submitted, and decide the case being fair as to the State and to the defendant?" This question was not designed to inquire whether the juror had a particular disqualification, as defendant would now seem to imply by argument. Defendant did not allege in his motion, nor does he now assert in argument, that Mr. O'Neil, by this answer, intended to deceive him. He did not allege in his motion that he was prejudiced by the fact that O'Neil was a licensed attorney, nor does he demonstrate in argument how this fact could have prejudiced him. We cannot find from the record that O'Neil intended to conceal this fact, or that he intended to deceive defendant, so as to make the exception to the rule applicable; nor may we find from this record that defendant was prejudiced by the fact that an ineligible person was a member and foreman of the jury.

Defendant did not allege, nor does he now contend, that it was not owing to his want of due diligence that he did not discover O'Neil's ineligibility before the jury was sworn to try the case. On the contrary O'Neil's ineligibility could have been determined before the jury was sworn by the exercise of due diligence. Due diligence required that he inquire on voir dire about the juror's particular lack of qualification; having failed to so inquire he

cannot now be heard to complain that the juror was ineligible and failed to notify the court or counsel. State v. Hermann, supra; see also: State v. Wilson, 230 Mo. 647, 132 S.W. 238, 239; State v. Gee, Mo., 280 S.W.2d 14, 17; State v. Williams, 335 Mo. 234, 71 S.W.2d 732, 735; State v. Waller, 88 Mo. 402; State v. Watson, Mo., 104 S.W.2d 272, 275 [3]; State v. Murray, 316 Mo. 31, 292 S.W. 434, 436–437 [1–5].

Examination of the record as required by Criminal Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

All concur.