STATE of Missouri, Respondent,

v.

Glen Evans ESCOE, Defendant-Appellant.

No. 59751.

Supreme Court of Missouri,
En Banc.

April 11, 1977.

Robert Beaird, Kansas City, for defendant-appellant.

Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

PER CURIAM.

Glen Evans Escoe (appellant), convicted of assault with intent to kill with malice aforethought and sentenced to imprisonment for 50 years, appealed to the Court of Appeals, Kansas City district. That court affirmed the judgment of conviction. The court held that while it was error to admit evidence of a subsequent robbery allegedly participated in by appellant, considered under the plain error rule [1] it did not result in manifest injustice or a miscarriage of justice, because evidence of his guilt of the assault was overwhelming. The case was transferred by our order, primarily to consider the application made by the court of appeals of the rule. We affirm, using parts of the opinion written by Chief Judge Pritchard of the court of appeals.

Appellant has briefed one point: "That the court erred [1] in not sustaining defendant's motion for a mistrial when the prosecuting attorney indicated in his opening statement that defendant had been involved in a subsequent, separate and distinct crime * * * and * * * [2] by allowing the State to present testimony concerning said subsequent crime during its case in chief."

■ That part of appellant's point designated [1] was not assigned as error in the motion for new trial and, therefore, is not preserved for review. That part designated [2] is not preserved for review, because no objection was made to testimony that appellant was a participant in a subsequent crime.

During the state's opening statement the following occurred:

"MR. HAGGERTY [assistant prosecuting attorney]:

Now, the evidence will further be that about four days later, this defendant, Mr. Escoe, and Mr. Perkins, were later to go out to the area of 35th and Woodland, Kansas City, Missouri, and while they were out there, there was some discussion about committing another robbery. And at that time, either Mr. Escoe or Mr. Perkins gave the witness for the State, Edwin Oliver, a gun to hold, and he * * * put it in his pocket. Later on the evidence will be, the witness will tell you the facts, this defendant, Mr. Perkins and Mr. Oliver, the State's witness, then went into a plumbing shop known as Monark Plumbing, at 35th and Woodland, and there after some period of time, some shooting took place.

MR. FLUKER [trial counsel for appellant]:

Your Honor, I am going to object to any further statements with regard to that. It should be stricken from the record."

At this point, and without a ruling on the objection, counsel went to the Bench where there was a brief discussion of the purpose and admissibility of evidence of the robbery and shooting at Monarch Plumbing Company. During this discussion counsel for the state said:

"The purpose of introducing the evidence about that robbery is solely to be able to identify how the state's witness acquired the gun. * * * We are not concerned with Mr. Escoe being at the Monark place; only the gun being there."

Counsel for appellant then pointed out that if this were the purpose it could easily have been handled by stating that appellant gave Mr. Oliver (the state's witness) the gun and that he (Oliver) and two unnamed individuals then participated in the robbery of the Monarch Plumbing Company, and that the police subsequently recovered the gun at the scene. The trial judge made this response to the remarks by both counsel:

"O.K., but now if the one—if the robbers did any shooting, that's not necessary to prove it or tie it up."

Counsel for appellant then moved for a mistrial, which was denied.

On December 14, 1974, at about 4:00 p.m., Donald Jones and his wife, Shirley, were driving up Independence Avenue in Kansas City on their way to North Kansas City.

1. Rule 27.20(c), Supreme Court Rules.

While stopped for a traffic light, the door on the passenger side was opened and appellant, with a gun in his hand, told Shirley to move over. She did. Appellant got in beside her. Another man whom she did not see got in the rear seat and told Donald to drive on as the traffic light changed. As Donald was driving, the man in the rear seat struck him on the side of the head. Appellant then took charge of the driving, telling Donald to get into the back seat. He did. The man in the back seat pulled him down, and after driving around for awhile, appellant drove into a wooded area on Cliff Drive and stopped. It was then still light. Appellant had grabbed Shirley's purse and Donald was asked for his wallet. Appellant took Shirley's glasses from her and threw them on the dash. In obedience to the order of the two men, Donald and Shirley got out of the car and as they walked they were pushed over the cliff and fell at least 15 feet. As they lay there Donald told Shirley not to move but to lie quietly until he told her to run. The two waited until they thought the two men had left, and then they began to run. After they took a few steps, appellant ordered them to stop, to turn around and lie down. Shirley could tell that it was appellant who gave the order by what he was wearing. As they were lying down appellant shot each of them twice. According to Donald the pistol was discharged four times and he heard a series of three clicks. After the shooting, the other man hollered for appellant to get out of there, and the two men left in the car.

Donald and Shirley then went up to the road where Donald passed out by a light pole. Shirley was able to walk along Cliff Drive were she summoned help from a passing car. They were both taken to a hospital for treatment, Donald's condition being critical.

Before appellant took Shirley's purse and her glasses (she could not see well without her glasses), she had a good look at him as being the person who was in the front seat with her. She made a positive in-court identification of him. At a lineup, with counsel for appellant present and participating in its constitution, Shirley picked out appellant who was viewed with three other persons, all dressed exactly the same and similarly posed with arm slings. Each of the persons was asked to say twice the words "Move over" and "Where's your money?" which helped in Shirley's identification at that time. Donald also made a positive in-court identification of appellant as one of the persons who jumped into the car, and who, at the foot of the cliff, with two pistols in his hands, ordered them to stop and to get back down on the ground. As he turned to follow this order, Donald looked directly into appellant's face from a distance of about 10 feet and could see him clearly. While in the hospital Donald picked out a photo of appellant from a number of photographs viewed by him, with no doubt that appellant was the man who robbed and shot them.

Edwin Oliver was called as a witness by the state. He testified that he had known appellant about a year and saw him on December 14, 1974, the day of the shooting, at Alice Thompson's house which was about four houses from where the Jones car was entered by appellant and his companion; that Daniel Perkins was also present at the Thompson house and had the gun, a .22 caliber weapon, which was shown by ballistics tests to have been used to shoot Donald Jones; that appellant and Perkins left and returned twice that afternoon, the last time being about 6:00 p.m., when the news was reported on television that two people had been pushed over a cliff. Oliver further testified: "I asked them [appellant and Perkins] was that them, and I asked Perkins, and he started laughing, and he said 'Yes,' that was them * * * I asked him [appellant], you know, what had happened, and he told me that Perkins pushed the people over the thing * * * [and that he did] nothing but drove the car * * *"; that neither Perkins nor appellant told him who did the shooting.

Oliver further testified that four days later, on December 18, he, Perkins and appellant were together and discussed robbing

the Monarch Plumbing Shop in the area of 35th and Woodland; that Perkins handed him a .22 caliber gun which appellant had handed Perkins; that they went to the Monarch Plumbing Shop that day and during the robbery some shooting occurred in which he (Oliver) was shot in the left thigh; that he ran from the plumbing shop through an alley, where he dropped the gun; that he escaped, but eight days later was apprehended. No objection was made to any of Oliver's testimony.

As indicated, the .22 caliber gun Oliver dropped in the alley was recovered by the police and a ballistics test showed that it was the weapon which fired the bullets taken from the person of Donald Jones.

■■■ There is no merit in appellant's contention that the court erred in not sustaining his motion for a mistrial made during the state's opening statement and based on the ground that state's counsel had informed the jury that appellant had been involved in a subsequent crime. Whether or not to declare a mistrial necessarily and properly rests largely in the discretion of the trial judge. *State v. Camper*, 391 S.W.2d 926, 927–928[2–4] (Mo.1965). We conclude from this record that the trial judge did not abuse his discretion in refusing to declare a mistrial. We have considered this contention in connection with our review of the second part of appellant's point under the plain error rule, although it was obvious on its face that there was no error.

■■■ As stated in the first paragraph of this opinion, the court of appeals held that it was error to admit evidence of the details of appellant's participation in a subsequent crime, the robbery of Monarch Plumbing Company in which shooting was involved. We, of course, agree with that holding. *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307[2] (banc1954). The court of appeals having so held, then proceeded to determine whether manifest injustice or miscarriage of justice had resulted from this error. Its determination was, as stated in its opinion, that such injustice or miscarriage of justice had not resulted, "because the evidence of * * * guilt was overwhelming." The quoted reason for the determination made is beginning to appear with some frequency in appellate opinions, somewhat as a "stock" or "catchall" reason why the the reviewing court had concluded that manifest injustice or miscarriage of justice had not resulted from an error. We do not agree that this "reason" is the ultimate test or that it should be used in deciding a case although the evidence of guilt *is* overwhelming.

■■■ The fact that evidence of guilt is overwhelming is not an accurate test to be applied in determining whether from an error there has been a miscarriage of justice. Manifest injustice or miscarriage of justice may result even where the evidence of guilt is overwhelming. It is not incumbent on the reviewing court to state a reason why it has determined that an error, not preserved or presented for review but considered under the plain error rule, did or did not result in manifest injustice or a miscarriage of justice. Yet it may do so. It is sufficient to say merely that the error did or did not result in manifest injustice or miscarriage of justice.

What we have said on this subject is, in essence, what the court said in *State v. Patterson*, 443 S.W.2d 104, 106–108[2, 4] (Mo.banc1969).

We have reviewed the whole record in this case and hold that, under the facts and circumstances it presents, the error in admission of evidence of the subsequent crime did not result in manifest injustice or a miscarriage of justice.

The judgment is affirmed.

All concur.