**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Ronald C. CLEMENTS,
Defendant–Appellant.**

**Ronald C. CLEMENTS,
Movant–Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. 15791, 16259.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 23, 1990.

Motion for Rehearing or to Transfer to
Supreme Court Denied
April 16, 1990.

Application to Transfer Denied
June 19, 1990.

John A. Klosterman, Columbia, for defendant-appellant.

William L. Webster, Atty. Gen., Andrea K. Spillars, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Presiding Judge.

A jury found defendant Ronald Clements guilty of murder in the first degree, § 565.020,[1] a class A felony, and he was sentenced to imprisonment for life without

---

1. All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules, except where indicated, are to Missouri Rules of Court, V.A.M.R. (1990).

eligibility for probation or parole. Defendant appeals, and that appeal is Case No. 15791.

After the jury trial, defendant filed a motion under Rule 29.15, seeking relief from the conviction. The motion was denied without evidentiary hearing. Defendant appeals from that denial, and that appeal is Case No. 16259. The appeals have been consolidated and will be dealt with separately in this opinion.

## No. 15791

Defendant's first point is that the trial court erred in denying his pretrial motion to suppress two statements made by defendant to law officers and in admitting those statements into evidence at the jury trial. He asserts the statements were "involuntary and the result of mental or physical coercion and duress in violation of defendant's constitutional protection against self-incrimination, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the Missouri Constitution, in that, although the law enforcement authorities who took defendant's statements had advised him of his right to remain silent as required by *Miranda v. Arizona* and had obtained defendant's waiver of that right, the totality of the circumstances rendered defendant's statements involuntary and the result of coercion, duress, promises or false pretenses, due to the inherently coercive environment of defendant's interrogation and defendant's youth."

Defendant entered pleas of not guilty and not guilty by reason of mental disease or defect excluding responsibility. Defendant offered evidence at the jury trial in support of the latter defense, which the jury rejected.

Although defendant does not challenge the sufficiency of the evidence to support the conviction, a review of the tragic events preceding the giving of the two challenged statements is in order.

The victim of the homicide was Steven Newberry, 19, who died on December 6, 1987. The state's evidence showed that Steven was beaten to death with ball bats

wielded by three young men, Jim Hardy, Pete Rowland, and defendant, all classmates of Steven at Carl Junction High School.

Late in the afternoon of December 6, 1987, Jim Hardy came to the home of the victim near Carl Junction. Hardy was accompanied by Pete Rowland and defendant. The four young men had previously "run around" together and were presumably friends.

Hardy stayed a few minutes in the Newberry house, and then Steven and Hardy joined the other two young men who were waiting outside in a car. The four young men proceeded to a rural area near Carl Junction. They got out of the car and walked toward a set of abandoned railroad tracks. Each carried a baseball bat. Steven had been told that the purpose of the trip was to catch and kill small domestic animals. Hardy asked Steven if he would like to kill a kitten they had brought along. Steven responded that he wanted to kill an animal and all four of them beat the kitten to death with the bats.

After the kitten was killed, somebody said, "Let's do something before it gets too dark." Hardy swung his bat and hit Steven in the face. Steven attempted to run away. Steven was chased by the other three young men until he stumbled and fell. Rowland, Hardy, and defendant proceeded to beat Steven to death with the bats. During the beating, Steven was lying on his side, curled into a fetal position. Each of the three young men struck Steven at least 20 times.

When Steven appeared to be dead, the felonious trio dragged his body to a nearby cistern. Hardy tied Steven's arms and legs with twine and tied a rock to Steven's waist. The trio then pushed Steven into the cistern, which was filled with water to a point six inches below ground level. Defendant threw Steven's jacket into the cistern. In returning to the car, the trio discarded the bats at various places in the vicinity and then went to Hardy's house. While there, they agreed to tell anyone

who asked that they had dropped Steven off at Barney's, a local convenience store.

The next morning, December 7, Steven's mother called the police and informed them that Steven had not returned home. Investigator Mike Randolph, of the sheriff's department, went to the high school and questioned defendant and other students concerning Steven's whereabouts. Defendant informed Randolph that they had dropped Steven off at Barney's.

Early in the evening of December 7, defendant was taken into custody and was interviewed at the Carl Junction Police Station.

Defendant was given the Miranda warnings and he signed a written waiver of his rights. The interview was conducted by Officer Mike Randolph. Also present during the interview was investigator Ray Youngblood. Captain Jim Wiseman of the Carl Junction Police Department was present during a portion of the interview. Defendant, born July 31, 1970, was over 17 years old and thus not a "child," § 211.021(2), for purposes of treatment as a juvenile offender.

Defendant's mother was present but, at defendant's request, left the room while the interview was conducted. The interview, which was tape recorded, consisted of questions propounded by Officer Randolph to defendant and his responses. The interview commenced at 8:33 p.m. and apparently lasted only a few minutes because the full transcription of it occupies only four pages of the record. That transcription was read to the jury as state's Exhibit 6 and is the first of the two challenged confessions.

Upon completion of the first interview, defendant accompanied the officers to the scene of the crime at approximately 11 p.m. He led them to the cistern where the body was found. About midnight defendant was taken to the county jail.

The next morning, December 8, at 8:23 a.m., Officer Youngblood again gave defendant the Miranda warnings and obtained a signed waiver of his rights. Officer Randolph again interviewed him in the same manner. State's Exhibit 9, a nine-page transcription of the interview, was read to the jury and is the second challenged confession.

Defendant filed a motion to suppress Exhibit 6 and Exhibit 9. An evidentiary hearing was held on that motion on April 12, 1988, three weeks prior to the jury trial. At that hearing, the state adduced the testimony of Officers Randolph, Youngblood, and Wiseman concerning the two interviews. Defendant presented no evidence.

Randolph testified that when Exhibit 6 was obtained defendant was "okay physically ... emotionally he was aware and attentive ... seemed to be a little upset." Randolph said that later defendant seemed to be very nervous and scared and about to cry. He was "very emotional and had uneasy breathing." Randolph testified that during that interview Youngblood told defendant that, if defendant cooperated, Youngblood would tell the prosecutor that defendant had cooperated. "That's the extent of any promises or inducement."

Officer Youngblood testified that during the first interview no officer made any promises to defendant, nor was defendant threatened or coerced. "The only thing we told him was we would tell the prosecutor that he cooperated. No one made any promises that the prosecutor would do anything." He said defendant "appeared to understand what he was doing." On cross-examination, Youngblood stated that the purpose in telling defendant that "we would tell the prosecutor that he cooperated" was to induce him to go ahead and talk.

Officer Wiseman testified that at the first interview defendant was told that if he cooperated "this would be made known to the court and that generally it would go easier on those that cooperated. I think I made that statement." Wiseman also said that Youngblood told the defendant, "If you stand up and take your licks you would feel better about it." Wiseman testified that at the first interview, which began before Wiseman came into the room, defendant's "general condition was he was very quiet, he was nervous."

At the conclusion of the hearing on the motion to suppress, the trial court found that, prior to both interviews, the defendant was given the Miranda warnings and executed waivers. The trial court also stated:

"The evidence shows that while the defendant was nervous, it does not appear that he was in such condition that he would have been unable to understand his constitutional rights and make an intelligent waiver of those rights. The promises made concerning his cooperation and the fact this would be relayed on to the prosecuting attorney or judicial authorities and that it might be helpful I don't think rise to the level of the type of promise that would prevent the statements from being voluntary. So as far as those two statements made, both the one at the Carl Junction Police Department and at the sheriff's department, the Court would find that these were made by the defendant voluntarily and intelligently and after he had been advised of his constitutional rights as set out in the Miranda decision, and therefore the motion to suppress those two statements is overruled."

Defendant argues that the trial court erred in not sustaining his motion to suppress the two statements because they were involuntary and "the result of mental or physical coercion and duress under the totality of the circumstances, including defendant's youth."

Defendant points to Officer Randolph's testimony that defendant appeared very nervous and scared, had difficulty breathing, and seemed as if about to cry. He cites the testimony that Officer Youngblood told defendant that if he cooperated the officers would inform the prosecutor of that fact. Defendant points to the evidence that the purpose of making that statement was to induce defendant to talk. Defendant also argues that "the presence of three or more officers during the interrogation and defendant's obviously emotional condition," warranted suppression of the statements as involuntary. Defendant argues that the statements were induced "by implied promises of leniency if defen-

dant would 'stand up and take his licks.' " Finally, defendant argues that there is no indication that the trial court "took defendant's youth into account when evaluating the totality of the circumstances to determine the voluntariness of defendant's statements."

A defendant is denied due process if his conviction is based, in whole or in part, upon an involuntary confession. Once a defendant objects to the admission of his confession, the burden of proving voluntariness is upon the state, but it need be proved only by a preponderance of the evidence. *State v. Lytle*, 715 S.W.2d 910, 915 (Mo. banc 1986). Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity. *Id.* The test for voluntariness is whether, under the totality of the circumstances defendant was deprived of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed. *Id.* No single fact is dispositive and factors to consider include defendant's age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion. *Id.* Voluntariness is determined on a case-by-case basis. *State v. Flowers*, 592 S.W.2d 167, 169 (Mo. banc 1979); *State v. Stokes*, 710 S.W.2d 424, 429 (Mo.App.1986).

Credibility of witnesses and conflicts in evidence are for resolution by the trial court. *State v. Stokes*, supra, at 428[12]. On appeal, the question is whether the evidence was sufficient to sustain the trial court's finding that the statement was voluntarily given. *State v. Alewine*, 474 S.W.2d 848, 852[3] (Mo.1971). The state's burden to show that a confession, given while in custody, was voluntary is met by a prima facie showing that the defendant was informed of his rights, that he was capable of understanding those rights, and that no physical force, threats, promises, or coercive tactics were used to

obtain the confession. *State v. Simpson*, 606 S.W.2d 514, 516–517[5, 6] (Mo.App. 1980). After the state has made a prima facie showing, if the defendant contends special circumstances rendered the conviction involuntary, it is incumbent upon him to produce evidence to support the contention. Id. See also *State v. Nolan*, 423 S.W.2d 815, 818 (Mo.1968).

 In the absence of police conduct causally related to the confession, there is no denial of due process. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. 107 S.Ct. at 522. The admissibility of a statement, made when the mental state of the defendant interfered with his free will, but made in the absence of police coercion, is governed by state rules of evidence rather than by due process considerations. *Colorado v. Connelly*, supra, 107 S.Ct. at 518. The United States Constitution does not speak to coercion "flowing from the 'voice of God.'" Id. at 524.

Defendant quotes language to the effect that the voluntariness of a confession depends upon "whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises however slight, [or] by the exertion of any improper influence'" *Bram v. United States*, 168 U.S. 532, 542–543, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). There has been a partial retreat from the stringency of that test.

"While the *Bram* test has long been followed, it has not been interpreted to be applied on a strict per se basis." *Tippitt v. Lockhart*, 859 F.2d 595, 596 (8th Cir.1988); *United States v. Grant*, 622 F.2d 308, 316 (8th Cir.1980).

In *United States v. Ferrara*, 377 F.2d 16, 17 (2nd Cir.1967), the court said:

"The *Bram* opinion cites with approval the statement in an English textbook that a confession is not voluntary if 'obtained by any direct or implied promises, however slight.' That language has nev-

er been applied with the wooden literalness urged upon us by appellant. The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined. * * *.' *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961); see *Haynes v. State of Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), quoting *Lynumn v. State of Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920–21, 9 L.Ed.2d 922 (1963).

That language from *Ferrara* was quoted with approval in *Tippitt v. Lockhart*, supra, at 597. Missouri courts have recognized that the language from *Bram* does not require literal compliance. *State v. Stokes*, supra, at 428.

 A confession, otherwise voluntary, is not tainted merely because the interrogating officer informs the suspect that if he gives a statement, the prosecutor or the court will be apprised that he cooperated. *Tippitt v. Lockhart*, supra, at 597; *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir.1987); *United States v. Fraction*, 795 F.2d 12, 14 (3rd Cir.1986); *United States v. Shears*, 762 F.2d 397, 401–402 (4th Cir. 1985). Missouri courts have held that confessions were voluntary even though preceded by an officer's suggestion that it was in defendant's "best interests" to confess, *State v. Klueg*, 781 S.W.2d 133, 135–136 (Mo.App.1989); that it would be in his best interests if he told the truth, *State v. Wilson*, 755 S.W.2d 707, 709 (Mo.App.1988); that "it's going to be better in the long run if he would get it out in the open," *State v. Dixon*, 655 S.W.2d 547, 556 (Mo.App.1983).

In *State v. Rickey*, 658 S.W.2d 951, 954 (Mo.App.1983), cases are cited which hold that each of the following is not an impermissible promise: "There are no deals but anything that you do tell us, I am sure will be in your favor;" "if the man is alive, it will help if we can find him"; it would be

made known to responsible authorities that he had cooperated; if he were to cooperate, the United States Attorney and Court would be made aware of that fact. The court also stated in *Rickey* that a confession is not "less admissible because it may have been prompted by remorse or braggadocio." In *United States v. Pelton*, supra, at 1003 the court said: "General encouragement to cooperate is far different from specific promises of leniency."

■ This court holds that the trial court's finding that the two challenged statements were voluntary is supported by the record. The statements made by the officers encouraging defendant to make the statements fall within the purview of the comments permitted by the foregoing authorities. Defendant was given the Miranda warnings and the trial court properly found that the statements were not the products of police coercion. Tears alone do not wash out a voluntary confession. Defendant's first point has no merit.

Defendant's second point is that the trial court erred in permitting the state, over defendant's objection, to introduce two portions of the deposition of J. Richard Harte, M.D., during the first stage, the guilt or innocence stage, of this two-stage trial. Defendant asserts that the trial court improperly permitted the state to show: (a) that Dr. Harte was of the opinion that defendant deliberated prior to killing Steven Newberry because "the question whether defendant deliberated constituted an element of the crime charged and was thus an ultimate fact reserved for the jury"; (b) that Dr. Harte was of the opinion that defendant would commit a similar crime in the future "in that the evidence did not aid the jury's determination of the validity of defendant's defense of mental disease or defect, but rather inflamed the jury's passions and prejudices by introducing evidence of the need to protect society from defendant's future bad acts."

Defendant concedes that the complaints contained in his second point are not included in his motion for new trial and thus not preserved for appellate review. Rule 29.-11(d). Defendant requests "plain error"

review of his second point under Rule 30.-20.

Prior to the trial, Dr. Harte, a psychiatrist, examined the defendant and diagnosed his condition as an identity disorder. His trial testimony was given by deposition. At the trial, during the presentation of the defense, defense counsel read portions of the deposition of Dr. Harte. The prosecutor then read to the jury additional portions of Dr. Harte's deposition, including the two portions challenged here.

Prong (a) of defendant's second point arises out of the following portion of the deposition read by the prosecutor:

"Q. [Prosecutor]: Another instruction—this is an instruction that a jury might get at some point in time—it requires that for the jury to find first degree murder, the jury must find that the defendant, Mr. Clements, did these acts after deliberation. That instruction goes on to define deliberation as meaning a cool reflection upon the matter for any length of time, no matter how brief. My question to you is do you have an opinion as to whether or not the defendant—my question to you is do you have an opinion, based on a reasonable medical or psychiatric certainty, as to *whether the defendant deliberated* or could have deliberated about this act?"

Outside the hearing of the jury, the defense counsel objected to the form of the question and stated: " 'Do you have an opinion as to whether the defendant deliberated?'—that's invading the province of the jury. He's answering that yes, it was. I think he invades the province of the jury when he makes the ultimate decision." Counsel also stated to the court that the question of whether defendant deliberated "was for the jury to decide, not for the psychiatrist. He can only testify as to whether defendant had the capacity." The court overruled the objection.

Thereupon, the proceedings resumed before the jury and the following occurred: "[Dr. Harte] (read by the prosecutor): *Yes, it was deliberated. It was planned for a different night.*"

"A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." § 565.020.1. As used in § 565.020.1, " 'Deliberation' means cool reflection for any length of time no matter how brief." § 565.002(3). Murder in the second degree is defined in § 565.021, and deliberation is not an element of that offense. Authorized punishment for murder in the first degree is "either death or imprisonment for life without eligibility for probation or parole, or release except by act of the governor." § 562.020.2. Such punishment is not authorized for murder in the second degree.

Among the instructions given by the court to the jury were Instruction 5, the state's verdict-director on murder in the first degree, and Instruction 6, the state's verdict-director on murder in the second degree. The court also gave Instruction 9 which contained the statutory definition of "deliberation" and, in effect, told the jury that a reasonable doubt with regard to the presence of the element of deliberation required a finding of not guilty of murder in the first degree. When the jury determined that the defendant was guilty of the homicide, Dr. Harte's answer bore directly on the crucial element of its degree.

It is clear that under the Federal Rules of Evidence Dr. Harte's testimony that the homicide was "deliberated" would be inadmissible. In fact there is a specific rule, Fed.R.Evid. 704(b), proscribing such testimony.

Fed.R.Evid. 704 reads:

"(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

In *United States v. Alexander*, 805 F.2d 1458, 1462–1463 (11th Cir.1986), the court said:

"The legislative history of the adoption of Rule 704(b) demonstrates that Congress did have a compelling governmental interest in mind when enacting the 1984 amendments:

*The purpose of this amendment is to eliminate the confusing spectacle of competing expert witnesses testifying to directly contradictory conclusions as to the ultimate legal issue to be found by the trier of fact.* Under this proposal, expert psychiatric testimony would be limited to presenting and explaining their diagnoses, such as whether the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect, if any, may have been." (Emphasis in original.)

In *United States v. Edwards*, 819 F.2d 262, 265 (11th Cir.1987), the court said:

"Congress did not enact Rule 704(b) so as to limit the flow of diagnostic and clinical information. Every actual fact concerning the defendant's mental condition is still as admissible after the enactment of Rule 704(b) as it was before.... Rather, the Rule 'changes the style of question and answer that can be used to establish both the offense and the defense thereto.' ... The prohibition is directed at a narrowly and precisely defined evil:

When, however, 'ultimate issue' questions are formulated by the law and put to the expert witness who must then say 'yea' or 'nay,' then the expert witness is required to make a leap in logic. He no longer addresses himself to medical concepts but instead must infer or intuit what is in fact unspeakable, namely, the probable relationship between medical concepts and legal or moral constructs such as free will. These impermissible leaps in logic made by expert witnesses confuse the jury."

In *United States v. Dunn,* 846 F.2d 761, 762 (D.C.Cir.1988), the court said:

"All expert evidence assists jurors in analyzing and drawing inferences from other evidence; in so doing it may support inferences as to ultimate intent. Indeed, all evidence as to what a defendant *did* bears upon what he *intended to do.* Suppose, for example, that an expert testifies at a homicide trial that the victim died of a poison administered daily in small doses over a long period. The evidence goes not only to what happened, but suggests extreme premeditation on the part of whoever doled out the poison. It is only as to the last step in the inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b) commands the expert to be silent." (Emphasis in original.)

In *United States v. Gipson,* 862 F.2d 714, 716 (8th Cir.1988), the court said:

"Rule 704(b) forbids 'testimony * * * as to whether [the defendant] had the specific criminal intent' required to commit the offense charged. *United States v. Cox,* 826 F.2d 1518, 1524 (6th Cir. 1987). Such testimony, because it specifically comments on the presence or absence of an element of the crime charged, is too conclusory to be helpful to a jury."

"Congress drafted Rule 704(b) to prevent medical experts from opining on the defendant's mental state *at the time of the alleged crime* when the defendant has raised the insanity defense." *U.S. v. Manley,* 893 F.2d 1221, 1225 (11th Cir.1990). (Emphasis added.)

Missouri courts have held that the opinion testimony of expert witnesses "should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved." *Sampson v. Missouri Pacific R. Co.,* 560 S.W.2d 573, 586[17] (Mo. banc 1978). To similar effect see *Hendricks v. M–K–T R. Co.,* 709 S.W.2d 483, 492[7] (Mo. App.1986). The essential test of admissibility of expert opinion evidence is whether it will be helpful to the jury. *Hendricks,* at 493[8]. "An expert witness may not be called upon for a conclusion of law." *Gardine v. Cottey,* 230 S.W.2d 731, 745[18] (Mo. banc 1950).

"The general rule is that a medical expert will not be allowed to invade the province of the jury and substitute his reasoning and conclusions for the reasoning and conclusions of the jury upon the issue, or issues, before the triers of fact.... For example, the medical expert in a will case may tell the jury whether certain symptoms betoken insanity, but he may not tell the jury whether a person having such symptoms and ergo presumably having such insanity is or is not too insane to be capable of making a will; for in such case the issue is: Did the testator have sufficient mental capacity to make a will? *Neither will a medical expert in a criminal prosecution be allowed to state whether the subject of the inquiry had mental capacity sufficient to know right from wrong, or to form a specific criminal intent to an extent rendering him amenable for his crimes.*"

*Deiner v. Sutermeister,* 266 Mo. 505, 178 S.W. 757, 761[4] (1915). (Authorities omitted; emphasis added.)

This court agrees with the Court of Appeals of Kentucky in *Koester v. Commonwealth of Kentucky,* 449 S.W.2d 213, 215 (Ky.1969), where it said:

"While opinion evidence of a mental condition may be relevant on the issue of intent or lack of intent at the time of the commission of a certain act, it is going a step farther to accept as competent an opinion concerning the lack of a specific intent on a particular occasion. Then, in effect, the opinion is not evidence of mental condition but is a factual conclusion of the witness on the ultimate issue before the jury which can be reached only by consideration of all the facts.

This may appear hypertechnical and the drawing of a fine line between admissible and inadmissible evidence, but the line is there. It is a distinction between the capability or incapability of the accused and his actual mental attitude at a

particular place and time. It is the difference between an objective opinion and a subjective conclusion. (Citation omitted.) Or put another way, it is the difference between the mental abnormality and the specific 'product' produced thereby."

■ Dr. Harte had professional qualifications and an opinion, based upon case history and examination, with regard to defendant's mental condition. Dr. Harte was not an expert, however, on the paramount issue of whether, at the time of the homicide, defendant in fact deliberated. The determination of that issue was within the capability of lay jurors. Deliberation was an ultimate issue for the jury alone under appropriate instructions.[2]

Use of a deposition at a criminal trial is conditioned, among other things, upon being "otherwise admissible under the rules of evidence." Rule 25.13; Rule 25.15. Where, as here, defendant has offered into evidence a portion of the deposition, the state "may introduce other portions containing *competent* and relevant testimony." *Conner v. Neiswender,* 232 S.W.2d 469, 473[7] (Mo.1950). (Emphasis added.) Dr. Harte's testimony that the homicide was "deliberated" was incompetent.

During his final argument the prosecutor made several references to the incompetent testimony of Dr. Harte on the issue of deliberation. The prosecutor said:

"The other thing which the doctors testified concerning was the issue of deliberation. And I want to go back over what that particular instruction says about deliberation.... But you can take the other facts surrounding this case and you can make your determination as to whether or not we have shown to you beyond a reasonable doubt whether somebody has deliberated. But there was medical testimony about that. The first doctor, the one in the deposition, when he was asked—I'm going to paraphrase it. I don't have it written down. When he was asked, Was the defendant

capable of deliberating? he answered, Well, yes. They planned it for another date. Cool reflection for a matter of time, no matter how brief.... Let's talk about whether or not this defendant coolly reflected upon this matter before he went out and took the life of Steven Newberry. First of all, ladies and gentlemen, you have him talking, as brought out through the psychiatrists.... Let's talk about in this deliberation about how he chose this victim, Steven Newberry. You heard the experts tell you that—... Ladies and gentlemen, if I didn't make it clear before, I'm making it clear now; this point I'm talking about is on this issue of deliberation. They picked Steven Newberry, as he reflected to his psychiatrists, because he was gullible."

No witness, other than Dr. Harte, gave direct testimony on the issue of deliberation. The only other evidence on that issue was contained in the challenged confessions and, although they clearly support a finding of deliberation, Dr. Harte's testimony may have tipped the scales on that all-important issue. This court holds that the trial court erred in admitting it over the objection of the defendant.

Another portion of the testimony of Dr. Harte was also improperly admitted, and that portion is the subject of prong (b) of defendant's second point. Over defendant's objection, the prosecutor read a portion of the deposition of Dr. Harte in which the witness was asked if he felt "there is at least some possibility, if not a probability, that [defendant] might do something like this again." Defense counsel objected on the ground "that these questions are irrelevant to this stage of the trial, they are only inflammatory to the jury, they do not go to the diagnosis of whether he suffers from a mental disease or defect." The court overruled the objections and Dr. Harte responded, "If we are picking a basketball team, the best place to pick a good team is by past track records.... I would say that he

---

**2.** Section 490.065, enacted in 1989, permits an expert witness in a *civil* action to state an opinion, if certain conditions are met, even if the opinion "embraces an ultimate issue to be decided by the trier of fact."

presents a far greater risk than the average person walking the street, yes."

"A defendant is on trial for what he has or has not done and not for what he might do." *State v. Raspberry*, 452 S.W.2d 169, 172 (Mo.1970). In *Raspberry*, the court held that argument by the prosecutor that the defendant should be imprisoned "so he can't do this again" was improper.

In *State v. Nickens*, 403 S.W.2d 582 (Mo. banc 1966), a psychiatrist, testifying as a witness for the state, said that methods of treatment then available would be of no avail for defendant's disorder and that "if unrestrained, further anti-social acts by this man will undoubtedly recur in the same way as in the past." The prosecutor referred to that testimony in his final argument. In reversing the conviction, the court said, at 587:

> "The jury may not take into consideration what defendant may or will do in the future in determining either guilt or punishment for the offense for which he is on trial. Certainly then this expert should not be permitted to express an opinion as to defendant's potential for crime, that he 'undoubtedly' will commit similar crimes in the future 'if unrestrained.'"

See also *State v. Couch*, 523 S.W.2d 612, 615–616[7] (Mo.App.1975).

This court holds that plain error, within the meaning of Rule 30.20, was committed in admitting the foregoing portions of the deposition of Dr. Harte, and finds that manifest injustice has resulted therefrom. It is true that evidence of defendant's guilt, primarily the two confessions, is overwhelming, but that factor alone does not eliminate plain error. In *State v. Escoe*, 548 S.W.2d 568, 571 (Mo. banc 1977), our supreme court said:

> "The fact that evidence of guilt is overwhelming is not an accurate test to be applied in determining whether from an error there has been a miscarriage of justice. Manifest injustice or miscarriage of justice may result even where the evidence of guilt is overwhelming. It is not incumbent on the reviewing court to state a reason why it has determined that an error, not preserved or presented

for review but considered under the plain error rule, did or did not result in manifest injustice or a miscarriage of justice. Yet it may do so. It is sufficient to say merely that the error did or did not result in manifest injustice or miscarriage of justice."

Years ago, Chief Justice Stone, speaking for the highest court in the land, said: "Not the least merit of our constitutional system is that its safeguards extend to all—the least deserving as well as the most virtuous." *Hill v. State of Texas*, 316 U.S. 400, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559 (1942).

The admission of the challenged portions of Dr. Harte's testimony deprived the defendant of a fair trial.

Defendant's second point is meritorious and requires reversal and remand. Other alleged errors raised by defendant need not be considered since they are unlikely to arise on new trial.

The judgment is reversed and the cause is remanded for a new trial.

No. 16259

On this appeal defendant contends that the trial court erred in denying, without an evidentiary hearing, his Rule 29.15 motion for post-conviction relief. The issue raised on this appeal is now moot because the instant judgment has now been vacated and the cause remanded for new trial.

Appeal dismissed.

HOGAN, C.J., concurs.

MAUS, J., dissents and files dissenting opinion.

MAUS, Judge, dissenting.

I respectfully dissent. It is my opinion the admission of Dr. Harte's testimony "Yes, it was deliberated. It was planned for a different night." does not constitute reversible error. I agree with the criticism of the use of expert opinions found in *United States v. Alexander*, 805 F.2d 1458 (11th Cir.1986) and quoted in the majority opinion. It may well be time for a legislative review of the law on that subject in this

state. See *State v. Thompson,* 695 S.W.2d 154 (Mo.App.1985). However, under the existing law of this state I believe that testimony was admissible.

That testimony must be considered in context. Dr. Harte was a qualified expert on mental conditions. He determined that the defendant suffered from an "identity disorder of adolescence", a mental illness. He had so testified when the questioned testimony was admitted.

Section 552.030.1 provides:

"A person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect he did not know or appreciate the nature, quality, or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of law."

Whether or not such mental condition existed at the time of the charged acts is an ultimate issue for the jury. It is well established that expert opinion that such mental condition did or did not exist at that time is admissible. *State v. Crawford,* 416 S.W.2d 178 (Mo.1967).

Section 552.015 in relevant part provides:

"2. Evidence that the defendant did or did not suffer from a mental disease or defect shall be admissible in a criminal proceeding:

\* \* \* \* \* \*

(8) To prove that the defendant did or did not have a state of mind which is an element of the offense."

Those provisions are drawn from the Model Penal Code § 4.02(1). Under statutes embodying those provisions, an expert opinion a defendant did or did not, at the time of the charged acts, as the result of mental illness, have mental capacity to form the state of mind which was an element of the offense, is generally held to be admissible. Annot., Admissibility of Expert Testimony as to Whether Accused had Specific Intent Necessary for Conviction, 16 A.L.R.4th 666 (1982). Some states do not permit expert opinion that a defendant did or did not in fact have such an intent at the time of the charged acts. See *Koester v. Commonwealth,* 449 S.W.2d 213 (Ky.1969), cited in

the majority opinion. A basis frequently assigned is that such an opinion invades the province of the jury. Annot., supra. However, that limitation is not valid in this state.

"In Missouri, an expert may testify as to his opinion on an ultimate issue in a criminal case. *State v. Paglino,* 319 S.W.2d 613 (Mo.1958), states:

Every opinion of an expert witness is to an 'ultimate' fact in the sense that it is a conclusion based upon facts supported by the evidence. We may assume that it would not be proper for an expert witness to express his opinion on the ultimate issue of whether appellant was guilty of the offense charged, but that was not done here, and as this court recognized in the *Eickmann [v. St. Louis Public Service Co.,* 363 Mo. 651, 253 S.W.2d 122 (1952) ] case, opinions of experts are often admissible upon vital issues which only the trier of fact may decide. *Id.* at 624.

But *Paglino* also says that 'an opinion (evidence) cannot "invade the *province* of a jury," and this [is true], even though the opinion is upon the very issue to be decided.' *Id.* at 623, *quoting Eickmann v. St. Louis Public Service Co.,* 363 Mo. 651, 253 S.W.2d 122, 129 (1952); *see also State v. White,* 621 S.W.2d [287] at 293 [ (Mo.1981) ]. *Compare State v. Smith,* 422 S.W.2d 50, 63 (Mo. banc 1967), *cert. denied,* 393 U.S. 895, 89 S.Ct. 150, 21 L.Ed.2d 176 (1968)." *State v. Taylor,* 663 S.W.2d 235, 239 (Mo. banc 1984) (emphasis in original).

The statement from *Paglino* that an opinion may not invade the province of the jury is often construed as a limitation upon the admissibility of expert opinion. An examination of the cited authority of *Eickmann v. St. Louis Public Service Co.,* 363 Mo. 651, 253 S.W.2d 122 (1952), establishes that is not the case. In *Eickmann,* the proffered testimony was that a personal injury plaintiff was a "malingerer". The objection was made that the opinion invaded the province of the jury. The Supreme Court held the opinion admissible even though it invaded the province of the jury.

"Thus an opinion (evidence) cannot 'invade the *province* of a jury,' and this, even though the opinion is upon the very issue to be decided. An objection that an expert opinion invades the province of the jury is not a valid one." *Eickmann*, 253 S.W.2d at 130 (emphasis in original). This principle has been consistently upheld.

"It is not a valid objection on a proper subject of expert testimony that the opinion of a qualified expert witness will invade the province of the jury, so long as the question does not call for a conclusion of law." *State v. Cochran*, 356 Mo. 778, 788, 203 S.W.2d 707, 713 (banc 1947). Also see *Allen v. St. Louis Public Service Co.*, 365 Mo. 677, 285 S.W.2d 663 (1956), 55 A.L.R.2d 1022 (1957); *Wessar v. John Chezik Motors, Inc.*, 623 S.W.2d 599 (Mo. App.1981); *State v. Brigham*, 709 S.W.2d 917 (Mo.App.1986).

The opinion of a qualified expert that a defendant suffering from a mental disease as a result thereof did not appreciate the nature, quality or wrongfulness of the acts charged is an expert opinion concerning a mental condition. The opinion of a qualified expert that a defendant suffering from a mental illness as a result thereof, at the time of the acts charged, did not have the capacity to deliberate is an expert opinion concerning his mental condition. I believe that the opinion of a qualified expert that a defendant suffering from a mental illness as a result thereof did not, in committing the acts charged, deliberate is also an opinion concerning his mental condition. This also is true if such an opinion is that a defendant suffering from a mental disease acted with deliberation. Such an opinion is no less admissible even though the facts would, as in this case, inexorably lead a lay jury to conclude, in agreement with or in spite of an expert opinion, a defendant acted with deliberation. The admissibility of the questioned testimony of Dr. Harte has been inferentially established in *State v. Anderson*, 515 S.W.2d 534 (Mo. banc 1974). In that case, the armed defendant went to the home of his paramour. There he separately shot her step-father and then her mother. A psychologist and a psychiatrist testified the defendant suffered from se-vere depression, a mental disease, and "that, as a result, he was unable to premeditate; and that in their opinion there was no premeditation in what appellant did." *Id.* at 536. The court refused to give an instruction on manslaughter as a lesser included offense of murder in the second degree. Upon the basis of § 552.030(3), now § 552.015.2(8), this was held to be error. In so holding, the court approved the following statement from the comment to § 4.02(1) of the Model Penal Code. " '... If states of mind such as deliberation or premeditation are accorded legal significance, psychiatric evidence should be admissible when relevant to prove or disprove their existence to the same extent as any other relevant evidence.' " *Anderson* at 538–539. In summary, I believe that by reason of § 552.015.2(8), under the existing law of this state, the questioned expert opinion of Dr. Harte was admissible.

Moreover, even if the questioned testimony of Dr. Harte was not otherwise admissible, the defendant made it admissible under a well established doctrine of evidence. That doctrine is denominated or described by a variety of terms including "Conditional Relevance and Competence", Vol. I, Wharton's Criminal Evidence, § 101, p. 358 (14th ed. 1985); "invited error", *State v. McFall*, 737 S.W.2d 748 (Mo.App.1987); and "opening the door", *State v. Hawkins*, 690 S.W.2d 198 (Mo.App.1985). The following is a summary of that doctrine appropriate to this case.

"[W]here the defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." *State v. Lingar*, 726 S.W.2d 728, 734–735 (Mo. banc 1987), cert. denied, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157.

As noted, the defendant in taking the deposition of Dr. Harte asked all the questions. As part of his case, the defendant read that deposition to the jury, omitting selected questions and answers. The omissions included the questioned testimony.

Portions of the deposition read to the jury tended to establish the defendant was pliable, easily influenced and dominated. *Further questions and answers inferred* that the defendant followed his companion Hardy because of the defendant's emotions or "dark side". Those questions and answers included the following:

"I asked him—I kind of described from the reports and so on; I said did that happen that way? I said, Can you make sense out of it? And he said no, he just felt like he was just kind of swept along by the idea that he was fascinated with, and he realized that his judgment was not good in carrying it through. And yet kind of, as I think he described it, it was like the dark side of himself was possessing and dominating himself, which he describes an interesting phenomenon in terms of good and bad, good and evil sort of conflict going on within himself, and he even talked over this kind of like voices within his own head which he was aware of were really not voices but his own thoughts that were in conflict."

\* \* \* \* \* \*

"QUESTION: Do you think that, based on your evaluation of him and what you learned about him, that he had to actually shun the dark side, as he called it, or these evil thoughts that he had? ANSWER: It was interesting. He said the dark side possessed him or controlled him or dominated him, much of the time, but it was like a conflict going on internally within himself as to what part would dominate."

\* \* \* \* \* \*

"QUESTION: You're right; I'm not sure that you've answered my question. Are you saying that he was unable to control his actions? ANSWER: Let me answer it in another way. I think intellectually he knew that it was wrong, but he was swept away emotionally."

The portions of the deposition read by the defendant raised the issue of deliberation and the inference he did not deliberate but was "swept along". The state properly introduced the questioned testimony to counteract an inference injected by the defendant.

Finally, even if the admission of the questioned testimony was error, whether or not it is reversible error must be determined considering all of the evidence. When so considered, the questioned testimony does not "impact so substantially upon the rights of the defendant that manifest injustice or a miscarriage of justice will result if left uncorrected." *State v. Driscoll,* 711 S.W.2d 512, 515 (Mo. banc 1986), cert. denied, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301. Also see *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *State v. Sidebottom,* 753 S.W.2d 915 (Mo. banc 1988), cert. denied, — U.S. —, 109 S.Ct. 515, 102 L.Ed.2d 550. In fact, when considered against the overwhelming evidence of deliberation, it would be harmless error within the doctrine as delineated in *State v. DeGraffenreid,* 477 S.W.2d 57 (Mo. banc 1972). Also see *State v. Marvel,* 756 S.W.2d 207 (Mo.App.1988); *State v. Whitley,* 750 S.W.2d 728 (Mo.App.1988).

In the state's initial closing argument, the prosecuting attorney briefly referred to that testimony. He did so after advising the jury they should consider all of the facts. The state made no further reference to the questioned testimony. It relied upon facts to establish deliberation. Those facts and the emphasis of the state are best illustrated by the following portion of the eloquent rebuttal argument made by the assistant prosecuting attorney.

"Let's talking [sic] about the planning stage of this, ladies and gentlemen. He planned—they had originally planned to kill him on Halloween. Of course that didn't work because Steven Newberry wasn't available. So then they decided to kill him on another night in November, and they went out there with the same scenario that ended up in the death of Steven Newberry. They went out there with the ball bats, with the cat, to the Well of Hell. The only problem is they were too stoned that time to do it and it didn't happen. But he was bound and determined, ladies and gentlemen, to get the act accomplished, and he did.

They went out on December 6th, again with ball bats, his with—his stick, the Ultra–Violence Stick. They went out and they picked up Steven Newberry. They handed him a bat. They had the cat. They indicated to him that they were going to take him out there so they could kill the cat. They took him out here in the deep recesses near Farmers' Chemical out of sight. They took him near the Well of Hell, and then they killed him.

And they took his lifeless—unfortunately he wasn't lifeless—body, and stuffed it into that well so they could be sure it wouldn't be found. They then used the twine that they had brought with them, tied it to a rock, and dumped him into that well, ladies and gentlemen.

I suggest to you that there is tons of evidence, a myriad of evidence, to show where he thought about that, where he reflected about that, where he planned that on many occasions, and in fact carried it out. I don't think there's any issue, ladies and gentlemen, as to deliberation."

The defendant also complains that the admission of Dr. Harte's answer concerning the risk to society presented by the defendant was reversible error. The defendant read to the jury the following portions of the deposition which preceded the answer about which he now complains.

" 'ANSWER: I think giving the diagnosis that he has an identity disorder is that. QUESTION: Okay. And if he is ill, is he treatable? ANSWER: I would say we'd like to think so. QUESTION: You have no opinion, based on reasonable psychiatric certainty, as to whether or not he can be rehabilitated and—ANSWER: Let me answer your question, maybe not directly, but I think he was probably as anxious and uncomfortable an adolescent as I have seen. And he was confused. He was searching—the fact that he was extremely uncomfortable with his present psychological mental state means that he's looking for some better way to understand his life himself and to give his life and self a sense of direction. QUESTION: Are you saying in different words that he's looking for treatment, he's looking for help? ANSWER: He said as much, that he was looking for help. And I asked him about the counseling, and he said—he said it was with his mother and they talked. But it's almost like, as he said, it really didn't get to the core of what he felt his problems were in terms of his confusion, the conflict between the darker side and the other parts of himself. QUESTION: You said in your report that you didn't feel it was necessary that Mr. Clements be hospitalized for treatment. "If however he showed any further decomposition from an already fragile sense of identity, then I feel hospitalization is appropriate." ANSWER: Uh-huh. QUESTION: You weren't speaking, I take it from your testimony today, that he's a danger to society as much as his need for medical and psychiatric treatment.' "

The defendant chose to inject the issue of his desire for reformation and the fact his illness could be treated without hospitalization. He apparently sought to raise an inference he posed no threat to society. Under the doctrine and authorities above cited, it was not error for the state to counteract this inference. Further, in view of the undisputed evidence of the facts, it was not plain error resulting in manifest injustice within the scope of the rule cited above.

I have considered the other points raised in the defendant's direct appeal. I find no merit in them and I would affirm his conviction. I have also considered the motion court's denial of the defendant's motion for postconviction relief under Rule 29.15. The motion court did not err in denying that motion, and I would affirm its decision.